James MAHELONA, J. Tek Yoon, and
the Nanakuli Surf Club, an unincor-
porated association, Plaintiff,

v.

HAWAIIAN ELECTRIC COMPANY,
INC., a Hawaii Corporation et
al., Defendants.

Civ. No. 76–0130.

United States District Court,
D. Hawaii.

Aug. 27, 1976.

John F. Schweigert, Lawrence D. McCreery, Honolulu, Hawaii, for plaintiffs.

Hugh Shearer, David L. Fairbanks, Goodsill, Anderson & Quinn, Honolulu, Hawaii, for defendant Hawaiian Elec. Co., Inc.

Stanley D. Tabor, Asst. U. S. Atty., Harold M. Fong, U. S. Atty., Honolulu, Hawaii, for federal defendants.

Laurence K. Lau, Deputy Atty. Gen., Ronald Y. Amemiya, Atty. Gen., Honolulu, Hawaii, for defendants Hawaii Dept. of Health and George A. L. Yuen.

## FINDINGS OF FACT and CONCLUSIONS OF·LAW

SAMUEL P. KING, Chief Judge.

*Introduction*

In 1972, Congress passed the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. §§ 1251–1376 (hereinafter referred to as "FWPCA"). Any person who introduces pollutants into navigable waters must comply with the provisions of the FWPCA, *see* 33 U.S.C. § 1311(a), or face the severe penalties outlined in 33 U.S.C. § 1319. The Environmental Protection Agency (hereinafter "EPA") administers the FWPCA through the National Pollutant Discharge Elimination System (hereinafter "NPDES") permit program. *See* 33 U.S.C. § 1342(a).

Defendant Hawaiian Electric Company (hereinafter "HECO") operates a power station at Kahe, Oahu. Five steam electric generating units are in operation at Kahe and three more units are in the planning stage. The Kahe power station supplies approximately 60% of the electric power on the island of Oahu.

In order to cool the generating units HECO pumps water from the ocean through the steam condensers located inside the plant. The ocean water, which rises considerably in temperature, is then discharged back into the ocean. This thermal discharge is classified as a pollutant by the FWPCA, *see* 33 U.S.C. § 1362(6), thus mandating that HECO obtain an NPDES permit from EPA in order to continue operation of the plant at Kahe.

HECO applied for an NPDES permit on May 17, 1973, and received the permit on May 3, 1975. The Department of Health, State of Hawaii (hereinafter "HDOH") adopted the EPA-issued NPDES permit on August 19, 1975 pursuant to 33 U.S.C. § 1342.[1]

---

1. Under 33 U.S.C. § 1342, a State may administer its own NPDES program subject to close supervision by EPA. *See generally* Comment, The Federal Water Pollution Control Act

Since the permit contemplates a discharge facility that will extend into navigable waters, HECO also applied pursuant to § 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, to the United States Army Corps of Engineers (hereinafter "the Corps") for a permit to construct the facility. The initial application was made on May 23, 1973, and the permit was issued by the Corps on January 16, 1976. Construction of the facility began six days later.

The discharge facility, as presently envisioned, will include the construction of a large, roughly triangular "transit basin" at the shoreline. The basin will permit the transfer of the heated water which is carried from the generating plant by a system of large pipes to several small pipes which will then carry the water into the ocean some 800 feet from shore. Although the small pipes are to be buried beneath the ocean floor, the walls of the transit basin will extend approximately 150 feet into the ocean and rise to a height of seven to ten feet above sea level (mean lower low water).

The walls of the transit basin will intersect a surfing site whose prime importance is that it is extremely well suited for teaching surfing to beginners.

■ Plaintiff Mahelona frequently surfs at Kahe; plaintiff Yoon is a Honolulu Parks and Recreation Department employee who teaches surfing at Kahe; and the Nanakuli Surf Club is an organization whose members surf at Kahe.[2]

Plaintiffs have sought an injunction against further construction of the discharge facility. Their primary[3] claim is that under the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347, (hereinafter "NEPA") an environmental impact statement (hereinafter "EIS") was required for the issuance of the permits at Kahe and that since no EIS was prepared construction pursuant to those permits must be enjoined.[4]

I. *Application of NEPA*

NEPA requires an EIS for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).[5] No EIS was prepared for the Kahe discharge facility and plaintiffs allege that either or both of the federal defendants, and the HDOH, should have prepared an EIS.

EPA argues that even if the Kahe project is a "major federal action significantly affecting the quality of the human environment" it is relieved of any responsibilities it had under NEPA by an exemption in the FWPCA relating to the issuance of certain NPDES permits. This contention will be discussed below.

■ The role of HDOH is basically irrelevant in determining whether an EIS was required in this case. Since HDOH simply adopted the NPDES permit which had originally been issued to HECO by EPA the question of whether HDOH issuance of an NPDES permit in the first instance would constitute major federal action is not presented by this case.[6] *Compare* Public

Amendments of 1972, 14 B.C. Ind. & Com.L. Rev. 672, 717 (1973).

**2.** Since the individual plaintiffs clearly have standing to sue, there is no need to address defendants' claim that the Nanakuli Surf Club does not have standing.

**3.** In view of the disposition of this case on the ground that NEPA has been violated, it is not necessary to address plaintiffs' claims that the notice and hearing provisions of the Rivers and Harbors Act have been violated by the Corps.

**4.** This court has jurisdiction to issue an injunction against any or all defendants pursuant to 28 U.S.C. § 1331(a). *See Save the Courthouse*

*Committee v. Lynn,* 408 F.Supp. 1323, 1330 (S.D.N.Y.1975).

**5.** NEPA provides in relevant part that all federal agencies shall:

. . . . .

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action

. . . . .

42 U.S.C. § 4332(2)(C).

**6.** In view of the significant role played by EPA in the State's administration of its own NPDES

Law No. 94–83 and *Conservation Society of Southern Vermont v. Secretary of Transportation*, 531 F.2d 637 (2d Cir. 1976). Similarly, subsequent adoption by HDOH can have no effect on whether or not EPA was obligated to prepare an EIS in the first instance.

The Corps makes two arguments to explain its failure to prepare an EIS. First, it argues that the Kahe project will not significantly affect the quality of the human environment.[7] Second, the Corps argues that it properly relied on EPA's determination that no EIS was required since EPA had been designated as the "lead agency" for the Kahe project.

The Corps' contention that the discharge facility would not have a significant environmental impact, on the record before the court at this time, is rejected. At the outset, it is noted that the Environmental Assessment which the Corps prepared did not explicitly conclude that the construction at Kahe would have no significant impact on the human environment. The Corps only stated, "Although the US Army Corps of Engineers identified environmental concerns which are addressed in the assessment, EPA determined that an environmental statement was not required. The planning, design, and partial construction of the project have progressed to a point where alteration of the plans would be costly to the public and delay completion of urgently needed power plant. Considering the present state of construction, an environmental statement would not be a practical or an effective instrument for disclosure

and mitigation of environmental impacts of the proposed action."[8]

■ This statement hardly amounts to a finding of no significant impact on the human environment; in fact, it almost implies that such an impact can be expected. The court also notes the contrast between this statement and the explicit, albeit dubious, finding in an earlier Environmental Assessment by the Corps regarding the on-shore intake facilities in the Kahe area that no significant environmental consequences could be expected.[9]

■ To substantiate its claim that there would be no significant environmental impact from the construction of the discharge facility at Kahe, the Corps relies very heavily on the lack of adverse public response to public notices regarding HECO's permit application. In a case such as this, however, where the Corps knows that a project will seriously interfere with an important existing activity in an area, it may not place such reliance on the silence of relatively unorganized and ill-informed citizens in determining the environmental impact of a proposed project. The expression of public concern, or the lack thereof, should be only one of many factors which the Corps considers in determining whether an EIS is required. This burden on the Corps is preferable to risking the substantial and often irreversible environmental and financial consequences which may result from a short-sighted and narrow approach by the Corps to its NEPA responsibilities.

program, *see EPA v. State Water Resources Control Board*, No. 74–1435 at 7–9 (United States Supreme Court, June 7, 1976), it appears likely that an EIS would be required of at least one responsible agency even when the State issues an NPDES permit in the first instance.

7. The Corps does not contest that the issuance of the construction permit was a "major federal action."

8. *See Environmental Assessment, Issuance of a DA Permit to the Hawaiian Electric Company for the Construction of a Discharge Structure at the Kahe Generating Station, Oahu, Hawaii* at 3.

9. *See Environmental Assessment for Units Five through Eight, Intake-Discharge Structures at Kahe Power Plant* at 4. Units six, seven and eight at Kahe are planned but as yet unbuilt. As its title indicates, the Environmental Assessment for the Intake-Discharge structures took into account the impact of units six, seven, and eight. Because the offshore discharge facilities at issue in this case are also intended to accommodate these units, the Corps erred in not considering the environmental consequences of the relationship between the discharge facility and units six, seven and eight. *Cf. Alpine Lakes Protection Society v. Schlapfer*, 518 F.2d 1089 (9th Cir. 1975) and *Sierra Club v. Morton*, 514 F.2d 856, 870 (9th Cir. 1975).

■ Furthermore, the lack of public objection in this case does little to convince this court that the discharge facility will not have a significant impact on the quality of the human environment at Kahe. The Environmental Assessment prepared by the Corps recognized that the discharge facility will interfere with surfing and on-shore fishing in the Kahe area. There was convincing testimony in this court that the Kahe area is the best, and perhaps the only, area along the Waianae Coast of Oahu for the safe instruction of novice surfers. In addition, there are undeniably significant aesthetic consequences resulting from the construction of· a wall extending 150 feet from shore at a height of 7–10 feet above sea level. These factors, combined with the proposed removal of 37,000 cubic yards of sand, gravel, coral and other reef material, raise "substantial questions" regarding the project's impact on the human environment. Therefore, on the record before the court, it appears that the Corps has failed to adhere to the applicable standard which requires an EIS "whenever a project '*may* cause a significant degradation of some human environmental factor.'" *City of Davis v. Coleman,* 521 F.2d 661, 673 (9th Cir. 1975), quoting *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5th Cir. 1973) (emphasis in *Davis* ).

Nothing in this opinion, however, would necessarily operate to prevent the Corps from preparing an adequate Negative Assessment demonstrating that no significant environmental impact will result from construction of the transit basin at Kahe, if that should be the Corps' conclusion after appropriate study of the matter. *Cf. Mid-Shiawassee County Concerned Citizens v. Train,* 408 F.Supp. 650, 654 (E.D.Mich.1976).

■ The second ground advanced by the Corps to explain its failure to prepare an EIS is that since EPA is the lead agency [10] for the Kahe project, the Corps was entitled to rely on EPA's decision that no EIS was

required. The record is clear that EPA never made such a determination. Instead, in response to an inquiry from the Corps about whether EPA would prepare an EIS, the Regional Administrator of EPA stated, "Pursuant to [33 U.S.C. § 1371(c)(1)] of the Federal Water Pollution Control Act Amendments of 1972, a Federal Environmental Impact Statement was not required *for the NPDES permit* for this existing facility." [11] The Corps was not entitled to rely on this determination by EPA. The section of the FWPCA on which EPA relied creates a limited exemption from NEPA for EPA; the exemption has no applicability to the Corps' determination of whether the issuance of a permit by the Corps significantly affects the human environment.

## II. *Application of the FWPCA Exemptions*

### A. *EPA*

EPA and HECO have strenuously argued that the FWPCA exempts EPA from what might otherwise be its obligation to issue an EIS. The defendants rely on 33 U.S.C. § 1371(c)(1) which provides:

Except for the provision of Federal financial assistance for the purpose of assisting the construction of publicly owned treatment works as authorized by section 1281 of this title, and the issuance of a permit under section 1342 of this title for the discharge of any pollutant by a new source as defined in section 1316 of this title, no action of the Administrator taken pursuant to this chapter shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.

There is no dispute that EPA was required to prepare an EIS only if the discharge facility is a "new source". "New source" is defined in 33 U.S.C. § 1316(a)(2) as "any source, the construction of which is

---

10. For a brief description of the lead agency concept, *see* Humphreys, NEPA and Multi-Agency Actions—Is the "Lead Agency" Concept Valid? 6 Nat.Res. Lawyer 257 (1973).

11. Letter from Paul R. De Falco, Jr. to District Engineer, Honolulu, Army Corps of Engineer [sic], June 27, 1974 (emphasis added).

commenced after the publication of proposed regulations prescribing a standard of performance under this section which will be applicable to such source, if such standard is thereafter promulgated in accordance with this section."

"Source", in turn, is defined as "any building, structure, facility, or installation from which there is or may be the discharge of pollutants." 33 U.S.C. § 1316(a)(3).

██ While the discharge facility arguably comes within this literal statutory definition of "source",[12] it cannot be considered a "source" within the framework of the FWPCA. The generating plants at Kahe are an existing source of pollution for which the discharge facility is the proposed method of control; the method of control is not also the source. This conclusion is supported by several aspects of EPA's regulatory scheme. First, while there are standards of performance governing steam electric generating plants, see 40 C.F.R. Part 423, there are no regulations applicable solely to discharge facilities. Secondly, the NPDES permit issued by EPA to HECO in this case is for the operation of the generating plants; the discharge facility is merely one of the special conditions which EPA required before it would issue the NPDES permit. The court therefore concludes that EPA's determination that the discharge facility is not a source within the meaning of the FWPCA is sufficiently reasonable to preclude this court from substituting its judgment for that of the agency. *See Train v. Natural Resources Defense Council*, 421 U.S. 60, 86, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).[13] Since the discharge

facility is not a source, it cannot be a new source and therefore no EIS was necessary for the NPDES permit at Kahe. The plant whose discharge is the source of the pollution is not a new source by definition.

### B. *The Corps*

The justifications advanced by the Corps for not preparing an EIS have already been rejected. Defendant HECO, however, contends that 33 U.S.C. § 1371(c)(2) provides the Corps with an exemption from its NEPA responsibilities. HECO's argument is rejected for two reasons.

██ First, it is well established that an agency cannot support its action or inaction by reference to reasons which it did not rely on at the administrative level. *See, e. g., Burlington Truck Lines v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). In this case, only HECO, but not the agency, has relied on 33 U.S.C. § 1371(c)(2) in its presentation to this court and therefore this argument must be rejected.

██ Second, even if the court were to consider HECO's contentions, they would have to be rejected. The statutory provisions on which HECO relies state only that NEPA does not authorize any federal agency to "review any effluent limitation or other requirement established pursuant [to the FWPCA]," 33 U.S.C. § 1371(c)(2)(A), or to "impose" any effluent limitation in connection with the issuance of a federal permit or license. *See* 33 U.S.C. § 1371(c)(2)

---

**12.** The discharge facilities fits within the FWPCA definition of a source as it is a "building, structure, facility or installation from which there is or may be the discharge of pollution." The FWPCA further defines the term "discharge of pollutants" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). For present purposes, it suffices to say that the thermal discharges at issue in this case are pollutants, *see* 33 U.S.C. § 1362(6), the Pacific Ocean is a navigable water, and the discharge facility is a point source under the definition in 33 U.S.C. § 1362(14).

**13.** This ruling should not be understood as an invitation to EPA to totally disregard environmental factors other than water quality in issuing NPDES permits for existing sources. Congress can hardly have intended, nor can the courts be expected to permit, the complete sacrifice of other environmental values to achieve good water quality. *Cf. Portland Cement Association v. Ruckelshaus*, 158 U.S.App.D.C. 308, 486 F.2d 375, 385 (1973), *cert. denied* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). Since in this case the Corps is clearly obliged to prepare an EIS, it is not necessary to determine the exact extent of EPA's responsibility to consider other environmental factors.

(B). The plain language of the statute serves only to preclude direct review or contradiction of an EPA established effluent limitation by an agency such as the Corps; there is nothing in the FWPCA which even impliedly prevents the preparation of an EIS by the Corps.[14] To conform with the FWPCA, of course, such an EIS could not reassess the water quality considerations which had already been addressed by EPA.

■ HECO claims that the preparation of an EIS and the possible denial of a Corps permit based on environmental concerns would necessarily constitute "review" or "imposition" of an effluent limitation since the design and location of the discharge structure are allegedly part and parcel of the effluent limitation. Even assuming that the definition of the term effluent limitation is as broad in this and other respects as HECO claims,[15] the Corps must still prepare an EIS. Any modifications requested by the Corps would at most constitute interference with the EPA-established effluent limitation but clearly would not be the "review" or "imposition" of an effluent limitation which the FWPCA proscribes.[16] Furthermore, HECO's argument goes too far; it would mean that the Corps has no choice but to issue a construction permit for any project which is being constructed pursuant to an NPDES permit or else run the risk of "reviewing" or "imposing" an effluent limitation.

The legislative history of 33 U.S.C. § 1371(c) reveals that it was inserted by the Conference Committee with only the sparse explanatory statement that this provision "clarifi[ed] certain relationships" between the FWPCA and NEPA. See S.Rep.No.92–1236, 92d Cong., 2d Session 149 (1972) U.S. Code Cong. & Admin.News 1972, pp. 3668, 3776. Several Congressmen explained in greater detail the purposes of 33 U.S.C. § 1371(c)(2)(A) and (B), and made it clear that "nothing in [those sections] should in any way be construed to discharge any federal licensing or permitting agency, other than EPA, from its full range of NEPA obligations to make a systematic balancing analysis of the activity proposed to be licensed or permitted." 118 Cong.Rec. 33701 (1972) (remarks of Senator Muskie). The statements of Representative Jones, 118 Cong.Rec. 33751 (1972) and Representative Dingell, 118 Cong.Rec. 33759 (1972) are to the same effect.

Since EPA is statutorily exempted from preparing an EIS for the discharge facility at issue, HECO urges that it is "absurd" to require an EIS "simply" because a Corps permit is required. The court is reassured that its interpretation of the statutory language and history is correct by recognizing the consequences which a contrary interpretation has had in this case. The result of the combined action of EPA and the Corps at Kahe has been to permit, if not to require, HECO to construct a concrete wall through the middle of a prime surf site in order to achieve compliance with a statute which lists as one of its prime purposes the achievement of "water quality . . . which provides for recreation in and on the water . . .". 33 U.S.C. § 1251(a)(2). An EIS might have avoided this tragedy.

---

**14.** This interpretation of 33 U.S.C. § 1371(c)(2) is bolstered by reference to the immediately preceding statutory section, 33 U.S.C. § 1371(c)(1). As explained above, in the latter section Congress totally exempted EPA from the responsibility of preparing an EIS in connection with the issuance of NPDES permits for existing sources. Had Congress intended such an exemption for agencies such as the Corps, it would presumably have chosen identical, or at least similar, language in 33 U.S.C. § 1371(c)(2) to accomplish the same result.

**15.** Effluent limitation is defined in 33 U.S.C. § 1362(11) as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance."

**16.** Despite HECO's arguments to the contrary, it would appear that the Corps could request modifications in the design of discharge facilities being built to comply with an NPDES permit and still leave undisturbed the effluent limitations contained in the NPDES permit.

III. *Relief*

A. *Laches*

Defendant HECO urges that the facts of this case mandate that plaintiffs' claims be barred by laches. HECO began applying for federal permits to build the Kahe discharge facility over three years before suit was filed. Various public notices and hearings brought almost no adverse public reaction. Six days after the final permit was issued on January 16, 1976, construction on the discharge facility began. The complaint in this case was filed on April 9, 1976, and plaintiffs' motion for a preliminary injunction was filed on May 22, 1976.

HECO introduced evidence, which went uncontradicted, that by the time suit was filed it had completed 16 per cent of the project at a cost of slightly less than $1.2 million. The work on the project was 25 per cent complete when the motion for a preliminary injunction was heard; by that time, HECO had spent almost $2 million. Under these circumstances, HECO urges that laches should apply.

 Two essential elements are required before laches will apply to a claim brought under NEPA. There must be a "lack of diligence by plaintiff and injurious reliance thereon by defendant. . . ." *See Lathan v. Volpe*, 455 F.2d 1111, 1123 (9th Cir. 1971) and *see also Lathan v. Brinegar*, 506 F.2d 677, 692 (9th Cir. 1974).

 Generally, only delay in the assertion of a legal right which plaintiffs knew about (or should have known about) will constitute the requisite lack of diligence. *See City of Davis v. Coleman*, 521 F.2d 661, 677 (9th Cir. 1975) and *Concerned About Trident v. Schlesinger*, 400 F.Supp.

454, 478 (D.D.C.1975). In this case, until the actual construction began, the plaintiffs were unaware of the nature of the serious changes which the discharge facility would create in the Kahe area. The public notices which HECO claims should have alerted plaintiffs did not clearly indicate the offshore consequences of the proposed project; that is, the wall which extends through the surfing area at Kahe. It was only after the commencement of the actual construction revealed the nature of the threat to the area that loosely organized citizens' groups such as the one involved in this case galvanized and sought legal redress. *See Steubing v. Brinegar*, 511 F.2d 489, 495 (2d Cir. 1975), *Jones v. Lynn*, 477 F.2d 885, 892 (1st Cir. 1973) and *Arkansas Community Org. for Reform Now v. Brinegar*, 398 F.Supp. 685, 691 (E.D.Ark.1975), *aff'd* 531 F.2d 864 (8th Cir. 1976).[17] Under the circumstances, the approximate date against which plaintiffs' diligence must be measured is the date on which construction began, January 22, 1976. By filing their complaint some five weeks after the construction began, plaintiffs proceeded at a reasonable rate. There was no lack of diligence.

HECO claims that plaintiffs were not diligent because they waited approximately seven weeks between the filing of their complaint and the filing of their motion for a preliminary injunction. Even if plaintiffs were not diligent in this respect, the court is not convinced that this lack of diligence after suit has been filed is relevant to HECO's claim that laches bar plaintiffs' claims. Furthermore, HECO cannot claim that it injuriously relied on this delay. Any prejudice suffered by HECO during this period resulted from HECO's decision to continue construction without moving this court for judgment in its favor.[18]

17. There is no claim that plaintiffs purposely delayed filing suit for the purpose of injuring HECO. Nor are plaintiffs alleged to have maintained a careful watch on the Kahe project throughout the administrative process but nevertheless filed suit several weeks after construction began. If proven, any such allegations might require a finding of lack of diligence.

18. HECO filed a motion for summary judgment on June 2, 1976. Presumably, this motion

could have been filed at any time after plaintiffs' complaint was filed. *See* Fed.R.Civ.P. 56(b). The court is aware that HECO felt obliged to continue construction in order to comply with the conditions in its NPDES permit. Under such circumstances, the court would have done in March what it has done in June—expedite resolution of the case to the extent compatible with careful consideration of all issues in order to minimize the costs of delay to all parties. *Compare*, Leventhal, Envi-

## B. *Propriety of Injunction*

 After a hearing on plaintiffs' motion for a preliminary injunction, the court issued the requested injunction in view of the strong likelihood that plaintiffs would prevail on the merits and the irreparable harm to the plaintiffs stemming from the violation of NEPA by the Corps. *See Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1323 (8th Cir. 1974) and *Scherr v. Volpe*, 466 F.2d 1027, 1034 (1st Cir. 1972).

Subsequent to a hearing on the plaintiffs' motion for a permanent injunction, the court continued the preliminary injunction [19] but requested that the parties explore and suggest to the court remedies other than a permanent injunction in view of the conflicting public interests involved.[20] Specifically, the court was concerned with balancing the strong policies in NEPA with the equally serious timetables for water pollution control imposed by the FWPCA. The court was further concerned with the uncontradicted evidence that any substantial delay in construction would increase the cost of the project by $10 million. Finally, various factors led the court and parties to agree that even if the Corps were ordered to prepare an EIS, the Corps would very likely conclude that HECO could build the project exactly as it had originally intended—through the surf site. Thus, the result of a full injunction would very likely have been satisfactory to none of the parties. The plaintiffs would be left with an EIS but no surf site. At the same time, the cost of the project would have been increased by $10 million. In addition, compliance with the FWPCA would have been substantially delayed.

## C. *Conclusion*

The parties reported back to the court with an agreement whereby HECO would attempt to construct a surf site near the original site in exchange for plaintiffs' dis-

ronmental Decisionmaking and the Role of the Courts, 122 U.Pa.L.Rev. 509, 542–43 (1974).

19. The court issued the following decision after the hearing on the permanent injunction:
(1) The individual plaintiffs have standing to bring this action.
(2) This court has jurisdiction of each of the several counts of the complaint.
(3) NPDES HI 0000019 was validly issued in accordance with applicable law.
(4) Specifically, the permit was not issued for the discharge of any pollutant by a new source.
(5) In view of the foregoing, it is not necessary to consider the extent to which this court may affect the operations of the Department of Health, State of Hawaii, in its water pollution program.
(6) The granting of the offshore construction permit (Permit No. PODCO–O 1078–SD) was a major federal action significantly affecting the quality of the human environment.
(7) In any event, there was no negative declaration by the Corps of Engineers negating this conclusion.
(8) There is no provision of law which excuses or exempts the Corps of Engineers from the requirements of NEPA in this connection.
(9) Failure to comply with NEPA requirements establishes plaintiffs' allegations of irreparable injury.
(10) An injunction prohibiting construction pursuant to the offshore construction permit issued by the Corps of Engineers to HECO is a possible remedy available to plaintiffs.
(11) Because of the conflicting public interests and policies expressed in the Federal Water Pollution Control Act and in the National Environmental Policy Act and of the necessity for this court to weigh and balance these conflicting interests in order to best accomplish the Congressional intent, a permanent injunction may not be the most appropriate remedy under these circumstances.
(12) The parties shall brief for the court possible remedies and alternative suggestions for relief and shall meet with the court at 9:00 A.M. on July 6, 1976, to discuss the same. If possible, written memoranda in this regard shall be exchanged on or before July 2, 1976.
(13) The preliminary injunction heretofore issued shall continue in force pending final judgment herein.

20. In requesting suggestions for alternative remedies, the court was relying on a growing body of cases which have demonstrated considerable flexibility in dealing with NEPA violations. *See, e. g., State of Ohio v. Callaway*, 497 F.2d 1235, 1240 (6th Cir. 1974), *Rhode Island Committee on Energy v. General Services Administration*, 411 F.Supp. 323, 327 (D.R.I.1976), *Arkansas Community Organization for Reform Now v. Brinegar, supra*, 398 F.Supp. at 699, and *City of Romulus v. County of Wayne*, 392 F.Supp. 578, 595 (E.D.Mich.1975).

missal of their complaint.[21] This agreement was approved by the court and the preliminary injunction was therefore dissolved.

21. If HECO's efforts in this regard prove unsuccessful, it is obligated under the agreement to take certain other actions to improve surfing opportunities along the Waianae coast.