PACIFIC LEGAL FOUNDATION et al., Plaintiffs,

v.

John R. QUARLES, Jr., et al., Defendants.

Civ. No. 77–521–HP.

United States District Court, C. D. California.

July 20, 1977.

Pacific Legal Foundation by Thomas E. Hookano, Robert K. Best, Sacramento, Cal., for plaintiffs.

Stanley E. Remelmeyer, City Atty., Roger P. Freeman, Asst. City Atty., Torrance, Cal., for plaintiff-intervenor, City of Torrance.

William D. Keller, U. S. Atty. by Barry J. Trilling, Asst. U. S. Atty., Los Angeles, Cal., Environmental Protection Agency, David R. Andrews, Regional Counsel, Anthony O. Garvin, Asst. Regional Counsel, San Francisco, Cal., for Federal defendants.

Evelle J. Younger, Atty. Gen. by Emil Stipanovich, Jr., Deputy Atty. Gen., Los Angeles, Cal., for the State of California, defendants.

## MEMORANDUM AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

PREGERSON, District Judge.

The Hyperion Wastewater Treatment Plant (Hyperion) is owned and operated by the City of Los Angeles. Each day, Hyperion collects, treats, and disposes of about 350 million gallons of wastewater gathered by a vast underground sewer system serving Los Angeles and adjoining communities. Hyperion currently applies primary treatment to about 250 million gallons of wastewater per day and secondary treatment to the remainder. After treatment the wastewater is separated into effluent and residue, i. e., sludge, and both are discharged into Santa Monica Bay. The effluent is discharged through an underwater pipe or outfall that extends about five miles into the ocean. The sludge is discharged into the mouth of a deep underwater canyon through another ocean outfall that extends about seven miles into the sea.

Under the Federal Water Pollution Control Act Amendments of 1972 (Water Act), 33 U.S.C. §§ 1251–1376, California water polluters are subject to the joint regulatory control of the Environmental Protection Agency (EPA) and the California State Water Resources Control Board (SWRCB). (For convenience future references to the EPA in connection with the regulation of Hyperion will be deemed references to the SWRCB as well.) Asserting authority under the Water Act, the EPA has ordered that Hyperion take steps to apply secondary treatment to all effluent and to cease the discharge of sludge into the ocean.

### STATUTORY FRAMEWORK

Ocean pollution is regulated in part by the Water Act and in part by the Marine Protection, Research, and Sanctuaries Act of 1972 (Marine Protection Act), 33 U.S.C. §§ 1401–1444. The EPA administers

both acts. The Water Act covers any discharge of a pollutant into the "navigable waters," which include the "territorial seas,"[1] of the United States plus any discharge from pipes or outfalls regardless of their termination point. 33 U.S.C. § 1362(12), (14). The Marine Protection Act covers pollution from vessels beyond the territorial seas. 33 U.S.C. §§ 1411, 1402(f). Thus, the general demarcation line between the two Acts' jurisdictions, with the exception of pipes or outfalls, is the three-mile limit of the territorial seas.

The Water Act sets out a comprehensive program for the regulation of water pollution into the navigable waters and from outfalls. Section 301 of the Water Act, 33 U.S.C. § 1311, makes "the discharge of any pollutant . . . unlawful" unless the discharger complies with the requirements of that section and several other enumerated sections. Section 301(b)(1)(A) requires that by July 1, 1977, industrial dischargers achieve effluent limitations based on "the best practicable control technology." By July 1, 1977, Section 301(b)(1)(B) and (C) require that publicly owned sewage treatment works meet effluent limitations based on secondary treatment as defined by the Administrator of the EPA or any stricter standard which may be imposed by other state or federal laws or regulations. By 1983, Section 301(b)(2)(A) requires that industrial dischargers meet effluent limitations based on "the best available technology economically achievable." Section 301(b)(2)(B) requires that by 1983, public sewage treatment works apply "the best practicable waste treatment technology." Section 301(e) states that the limitations established under Section 301 shall apply to all point sources of pollutants as defined in Section 502(14), 33 U.S.C. § 1362(14).

Among the most important of the other sections of the Water Act to which Section 301 refers and makes compliance mandatory is Section 402, 33 U.S.C. § 1342, which establishes the National Pollutant Discharge Elimination System requiring that every polluter obtain a permit from either the EPA or an authorized state-administered program. (Hereafter such permits shall be referred to as NPDES permits.)

Other sections of the Water Act relevant to this litigation include Section 405, 33 U.S.C. § 1345, which requires an EPA permit specifically for the disposal of sewage sludge when such disposal results in pollutants from the sludge entering the navigable waters, and Section 403, 33 U.S.C. § 1343, which requires that any discharge into the ocean must be in compliance with certain EPA promulgated guidelines based on the "degradation" of the waters.

The Marine Protection Act also uses a permit system to regulate the dumping of pollutants from vessels beyond the territorial seas. 33 U.S.C. § 1411. As is true of Section 403, but not of Section 301 of the Water Act, the Marine Protection Act focuses on the harm to the environment caused by the discharge of pollutants into the water. Under the Marine Protection Act, the EPA may grant a permit only if it determines that the dumping will not "unreasonably degrade" the environment. 33 U.S.C. § 1412.

## INTERIM SLUDGE DISPOSAL PROJECT AND RELIEF SOUGHT

Pending an ultimate solution to the problem of sludge disposal, an interim sludge project was designed for Hyperion requiring that sludge be centrifugally de-watered and then transported to a sanitary landfill. The EPA contemplates awarding Los Angeles a grant as provided under Sections 201–213 of the Water Act, 33 U.S.C. §§ 1281–1293, to partially fund the interim sludge project. The EPA has also made a construction schedule for the project a manda-

1. The Water Act defines "navigable waters" as "the waters of the United States, including the territorial seas." § 502(7), 33 U.S.C. § 1362(7).

The Water Act defines "territorial seas" as "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles." § 502(8), 33 U.S.C. § 1362(8).

tory provision in Hyperion's NPDES permit.

In objecting to the Hyperion interim sludge disposal project, plaintiffs maintain that the EPA is about to cause the expenditure of a great deal of money on a project that will result in substantial land-based environmental consequences, all in reliance on an untested assumption that the disposal of sludge into the ocean is more harmful to the environment than the disposal of sludge on land. Plaintiffs, in their first two causes of action, ask that the interim sludge disposal project be enjoined until the preparation of Environmental Impact Statements (EIS) under Section 102(2)(C), 42 U.S.C. § 4332(2)(C), of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347. Plaintiffs contend that two EIS's are required, one for the contemplated EPA grant to fund the interim sludge project and another for the EPA's alleged national policy against disposal of sludge into the ocean. Plaintiffs also seek in their third cause of action a declaration that the Water Act does not prohibit ocean disposal of sludge and that, accordingly, any EIS for the Hyperion interim sludge project should consider ocean disposal as an alternative. The matter is now before the court on plaintiffs' motion for preliminary injunction seeking to restrain defendants from funding or requiring the implementation of the Hyperion interim sludge disposal project.

## EIS AS TO THE GRANT

■ The EPA has stated that it will prepare an EIS for the Hyperion interim sludge disposal project and will also delay the grant of federal funds to Los Angeles for the project until the EIS is completed. It follows, argues the EPA, that plaintiffs' first cause of action is moot. Plaintiffs argue that their claim is not moot because the EPA still intends to enforce its orders requiring Los Angeles to proceed with the interim sludge project despite the delay in federal funding. Postponing the project pending the completion of the EIS seemed the sensible course until the court confronted the difficult question of how to apply

Section 511(c) of the Water Act, 33 U.S.C. § 1371(c), which seeks to define the relationship of that Act to NEPA. Section 511(c) exempts the EPA from preparing an EIS except when a grant of federal funds for construction of publicly owned sewage treatment works or an NPDES permit for a new source of pollution is involved. This section, therefore, exempts the EPA from preparing an EIS when issuing regulations defining secondary treatment and when issuing NPDES permits that apply effluent limitations based on those regulations to particular sewage treatment works. In this case, a construction schedule for the interim sludge project was included as a requirement in the Hyperion NPDES permit. As a condition of the NPDES permit, the construction project is exempt from the EIS requirements of NEPA because the project itself is neither an EPA grant nor a permit for a new source of pollution. *Mahelona v. Hawaiian Electric Co., Inc.*, 418 F.Supp. 1328 (D.Haw.1976). Thus, the language of Section 511(c) leads to the conclusion that the EPA can, without an EIS, order Los Angeles to build the interim sludge disposal project while the EPA is prevented, until it prepares an EIS, from awarding a grant to help pay for the project. While this result may seem anomalous, the plain wording of the Water Act specifically limits the EPA's duty to prepare an EIS to the grant alone.

■ This conclusion is supported by *State Water Control Bd. v. Train*, 424 F.Supp. 146 (E.D.Va.1976), which held that the enforcement provisions of the Water Act operate independently from the grant provisions. Just as Virginia in that case was not excused from meeting the Water Act's 1977 deadline even though needed federal funding was unavailable, so Los Angeles cannot be excused from complying with its NPDES permit even though needed federal funding will be delayed pending the preparation of an EIS. Although the legislative history of the Water Act is occasionally conflicting as to the scope of the exemption that Section 511(c) provides from the operation of NEPA, the clear purpose of the exemption is to avoid delays, caused

by preparation of lengthy EIS's, in implementing the Water Act's goals.[2]

## EIS AS TO THE NATIONAL POLICY AGAINST SLUDGE IN THE OCEAN

■ In its Answer, the EPA has admitted that it endorses a national policy to eliminate the disposal of sludge into the ocean. The plaintiffs argue that the implementation of this national policy constitutes a major federal action having significant environmental consequences so as to require the preparation of an EIS. Assuming *arguendo* that under the facts of this case the implementation of this particular policy qualifies as an "action" under NEPA, as interpreted by *Kleppe v. Sierra Club*, 427

U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), this court concludes that plaintiffs' request for injunctive relief cannot be supported on the ground that—without benefit of an EIS—the EPA is implementing this no-sludge policy.

Plaintiffs claim that the national policy prohibiting sludge disposal into the ocean is not exempted from NEPA's EIS requirements by Section 511(c) of the Water Act because this no-sludge policy is not an action taken by the EPA pursuant to the Water Act, but is instead an administrative decision "ultra vires" the Water Act. Insofar as the challenged national policy pertains to dumping of sludge into the territorial seas and discharging of sludge from

2. The Conference Report describes Section 511(c) as follows:

"Section 511(c) clarifies certain relationships between the Federal Water Pollution Control Act (FWPCA) and the National Environmental Policy Act (NEPA).

The Federal Water Pollution Control Act Amendments of 1972 charge the Administrator of EPA with a comprehensive mandate to regulate the discharge of pollutants into the waters of the United States. The sole purpose of the Act is the enhancement of environmental quality. In the administration of the Act, EPA will be required to establish numerous guidelines, standards and limitations. With respect to each of these actions, the Act provides Congressional guidance to the Administrator in as much detail as could be contrived. Virtually every action required of the Administrator by the Act, however, involves some degree of agency discretion, judgments involving a complex balancing of factors that include technological considerations, economic considerations, and others. The Act seeks to guide the Administrator, to the extent possible, in the matter of assigning relative weight to the many factors that he must consider.

If the actions of the Administrator under this Act were subject to the requirements of NEPA, administration of the Act would be greatly impeded."
S. Conf. Rep. No. 92–1236, in 1 Legislative History of the Water Pollution Control Act Amendments of 1972 (compiled for the Senate Comm. on Public Works by the Library of Congress), Ser. No. 93–1, p. 332 (1973) (hereafter Leg. Hist.); U.S.Code Cong. & Admin. News 1972, pp. 3668, 3826.

At the final Senate debate, Senator Muskie submitted an exhibit stating that:

"The purpose of this bill is to set rapidly in motion an effective water pollution control program. The Act sets tight time limits within which the Administrator must take a multitude of actions, each heavily dependent on the other, that will, in the aggregate, produce a meaningful, effective, and truly workable program as quickly as possible. Should the Administrator find himself confronted with substantive or procedural requirements extraneous to this Act, the very program that the Act seeks to establish would be imperiled.

\* \* \* \* \* \*

This Act specifically identifies factors to be considered by the Administrator in making this kind of balancing analysis and the Conferees concluded that the substantive purposes and procedures of the Act fully satisfy and go far beyond what is required by 102(2)(b) [of NEPA] and would be frustrated if other factors were to be injected into the decisions of the Administrator by NEPA."
1 Leg. Hist. at 182.

The legislative history further reveals that the primary stimulus for Section 511(c) was a desire to insulate NPDES *permits* from EIS requirements. See, e. g., the letter from William Ruckelshaus, Administrator of the EPA, to the Office of Management and Budget, recommending presidential approval of the bill, stating that the exemption in 511(c) "is in response to Administration urging to remove a major obstacle from the efficient functioning of the permit program." 1 Leg. Hist. at 151. Debate on Representative Abzug's proposed amendment to the House bill reveals that difficulties encountered in enforcing the permit system under the Refuse Act led to Congressional concern over the application of NEPA's EIS requirements to the NPDES permit system. 1 Leg. Hist. at 536–539; also see the remarks of Senator Hart upon the Senate consideration of the Conference Report, October 4, 1972, 1 Leg. Hist. at 210.

ocean outfalls—areas of ocean pollution covered by the Water Act—the EPA contends that this policy is not only promulgated pursuant to the Water Act but mandated by Section 301 of the Act· that requires public treatment works to apply secondary treatment techniques to their effluent discharge. The application of secondary treatment as defined in 40 C.F.R. Part 133 would, of necessity, eliminate the discharge of sludge. Plaintiffs attempt to rebut this contention by arguing that Section 301 does not apply to deep ocean outfall discharge because such discharge can be regulated only under Section 403 which sets out special criteria for the ocean disposal of pollutants. Underlying the statutory interpretation question of whether Congress intended Section 301 or Section 403 to apply to ocean discharging sewage plants is a serious dispute regarding the regulatory policy to be applied to ocean pollution. Section 301 deals with the technological control of pollutants at their source, without regard to their effect on the immediate environment, while Section 403 speaks to a system of pollution control based on a study of the effects of pollutants on the marine ecology. Thus, the EPA, arguing in favor of Section 301's application, wants the strict technological standards—clearly applicable to the pollution of inland waters—to apply as well to ocean pollution regulated by the Water Act, i. e., to pollution within the territorial seas and through outfalls. Plaintiffs, arguing for Section 403's exclusive application to ocean pollution regulated by the Water Act, want, instead of strict rules, a case-by-case balancing analysis of pollution controls based on ecological needs of particular marine locales.

Sections 301 and 403 of the Water Act, manifesting two different philosophies of pollution control, exist side by side with no explanation of their intended relationship, i. e., whether the more general section, 301, should defer to the more specific, 403, or whether both sections and their inherent philosophies are meant to apply concurrently. In arguing that Section 403 controls,

plaintiffs first assert that Congress intended a different scheme of regulation for deep ocean outfalls and deep ocean dumping from the scheme intended for navigable waters. The "end-of-pipe" technological scheme of Section 301, argue plaintiffs, was intended to apply only to the navigable waters. In support of their argument plaintiffs point out that Section 301(b) provides that effluent limitations are to be achieved by certain specified dates, "to carry out the objective of [the Water Act]," and that Section 101(a)(1), 33 U.S.C. § 1251(a)(1), provides that, "The objective of [the Water Act] is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that . . . (1) it is the national *goal. that the discharge of pollutants into the navigable waters* be eliminated by 1985." (Emphasis added.) Plaintiffs then point out that the only specific mention of a goal for waters beyond the navigable waters is in Section 101(a)(6) which sets forth a "national policy that a major research and demonstration *effort be made to develop technology necessary to eliminate the discharge of pollutants into* the navigable waters, waters of ·the contiguous zone, and *the oceans.*" (Emphasis added.) The slight difference in the generally stated goals for navigable waters and for the oceans that can be extracted from comparing Sections 101(a)(1) and 101(a)(6) forms a weak basis for the conclusion that Section 301, which on its face appears to cover all water pollution within the jurisdiction of the Water Act, was not meant to apply to pollution of the ocean seas through deep ocean outfalls.

Plaintiffs attempt to bolster their argument that Section 403's standards control by referring to legislative history indicating that Congress intended that the regulation of ocean dumping under the Water Act be consistent and uniform with the regulation of ocean dumping under the Marine Protection Act.[3] Under the Marine Protection

---

**3.** At the Senate debate on S. 2770, November 2, 1971, Senator Magnuson explained the relationship of the Marine Protection Act and the

Water Act as follows:
  "[T]he committees have agreed that the regulation of discharges of pollutants within

Act the EPA may grant permits for deep ocean dumping from vessels only when it "determines that such dumping will not unreasonably degrade or endanger human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities." 33 U.S.C. § 1412. A goal of uniform treatment of ocean dumpers, plaintiffs argue, would explain why Section 403, the only section of the Water Act specifically dealing with permits for ocean pollution, provides that the reference point for regulation shall be "degradation of the waters." The argument for uniformity in regulation of ocean dumping under the Marine Protection Act and the Water Act is not entirely consistent with plaintiffs' argument that Section 301's reach is limited to "navigable waters."[4] Under the latter argument, since ocean dumping within the three-mile limit of the territorial seas would constitute dumping into navigable waters, such dumping would be subject to the requirements of Section 301 rather than Section 403 alone, thus precluding uniformity of treatment of ocean dumpers under the Water Act and the Marine Protection Act

since at least some ocean dumpers would be subject to the strict technological control of Section 301 rather than the degradation standard of Section 403 and the Marine Protection Act.

■ Plaintiffs also point to legislative history apparently indicating that Congress intended Section 403 rather than Section 301 to regulate ocean dumping.[5] This legislative history does not, however, affirmatively rule out the possibility that Section 403's requirements may apply in addition to Section 301's. Furthermore, this legislative history should be read in proper context. Section 403 served as the focal point for the resolution of the overlapping jurisdictions of two congressional committees, the Committee on Public Works and the Committee on Commerce. The Senate Report reflects an agreement that the Water Act, to be reported from the Committee on Public Works, would regulate the pollution of the navigable waters, including the territorial seas, plus pollution through outfalls regardless of where the outfall ends, while the Marine Protection Act, to be reported from the Commerce Committee, would regulate

the territorial and internal waters of the United States will be governed by the provisions of S. 2770 [the Water Act]. Beyond the territorial sea, in the contiguous zone and other high seas areas of the oceans, the regulation of transportation for dumping and dumping of materials originating in the United States will be governed by the provisions of H.R. 9727 [the Marine Protection Act]. I want to state for the record that the two committees have worked closely together to reach this understanding and to achieve uniformity as to the dumping criteria, enforcement, and penalty provisions of the two bills."
2 Leg. Hist. at 1380.

4. Under plaintiffs' navigable-waters argument, the three-mile limit would mark the point where regulation under Section 301 would end and regulation under Section 403 (as to deep ocean outfalls) or the Marine Protection Act would begin. Under plaintiffs' uniformity-of-ocean-dumping-regulation argument the coastline would mark the point where regulation under Section 301 would end and regulation under 403 (as to dumping within the territorial seas and all outfalls) or the Marine Protection Act would begin.

5. Upon the Senate consideration of the report of the conference, October 4, 1972, Senator Muskie submitted an exhibit containing the following remarks:

"The Conferees intend that Section 403 regulate the discharge of any pollutants subject to this Act from any outfall sewer regardless of where that sewer ends and from any vessel within the three mile limit, any other legislation to the contrary notwithstanding."
1 Leg. Hist. at 177.

A similar reference to Section 403 is found in Senator Hollings remarks at the Senate debate on S. 2770, November 2, 1971:

"The operative provisions of the agreement [between the Committees on Commerce and the Public Works as to jurisdiction over ocean pollution] are that the discharge of pollutants from outfalls, vessels, or any other source, within the internal or territorial waters of the United States will be governed by the [Water Act]. The regulation of such discharges will be through a permit program, applying discharge criteria provided in Section 403 of the act."
2 Leg. Hist. at 1381.

pollution beyond the territorial seas with the exception of outfalls. Thus, references in the legislative history to regulation of ocean dumping under Section 403 may be interpreted as standing for the proposition that the Water Act and not the Marine Protection Act regulates outfalls and the territorial seas, rather than for the proposition that Section 403 and not Section 301 of the Water Act regulates outfalls and the territorial seas.

Plaintiffs next argue the comparative uselessness of Section 403 if Section 301 already applies to all ocean pollution covered by the Water Act. Plaintiffs point out that wastewater effluent, after receiving secondary treatment, is nearing the quality of drinking water, and thus unlikely to require additional treatment to avoid the "unreasonable degradation" of ocean waters. While the argument that Section 403 will in practice be superfluous may well be true with regard to sewage treatment plants, situations may well arise with industrial polluters in which Section 301's requirement of the "best practicable" treatment methods may not be enough to prevent the industrial discharge from unreasonably degrading the ocean environment.

█ Plaintiffs also argue that the application of Section 301 to sewage sludge disposal would make Section 405 of the Water Act, 33 U.S.C. § 1345, superfluous. Section 405 is the only substantive section of the Act specifically dealing with sludge disposal. The wording of the Act and the legislative history clearly indicate, however, that Section 405 was not intended to be the primary source of regulation of sludge but was intended as a cautionary measure to provide additional protection against dangers to navigable waters caused by disposal methods unregulated by Section 301—careless land disposal and deep ocean dumping of sludge from vessels.[6]

The legislative history, although not conclusive, on balance supports the interpretation now urged by the EPA.[7] The only detailed statement in the legislative history speaking directly to the regulation of sew-

---

**6.** Senator Muskie's exhibit presented during the Senate consideration of the report of the conference, October 4, 1972, refers to Section 405 as follows:

"The Conferees have included a provision, not in either bill, which relates to the disposal of sewage sludge from waste treatment plants. During the Conference it became apparent that, unless a regulatory mechanism was established to control the by-products of advanced waste treatment plants, the disposal of residual sludge could cause a serious problem. Present practices which permit sewage sludge to be hauled out to sea and dumped or placed in areas on land where it is washed into streams and lakes, without regard to the impact on health and welfare, recreation, fish and shellfish and wildlife, are unsatisfactory.

Under Section 405, . . . disposition of sewage sludge in any manner which might affect the inland or coastal navigable waters would be prohibited (either by dumping sludge on land in such a fashion as to run off into waters or dumping in the ocean in such a manner as would have it returned into territorial waters)."

1 Leg. Hist. at 170–71.

Senator Boggs, who originally introduced Section 405, made the following remarks at the Senate consideration of the conference report, October 4, 1972:

"[S]ection 405 of the conference report establishes a special procedure controlling the disposal of sewage sludge. This section covers several possible situations. For example, it would require an EPA permit if the sludge is deposited on land, and there is a possibility that the sludge may run off into a river.

Or it would require an EPA permit if sludge is dumped anywhere at sea, and there is a likelihood that currents would sweep the sludge back into the navigable waters of the United States."

1 Leg. Hist. at 212.

**7.** The EPA, itself, has not been completely consistent in its approach to ocean pollution under the Water Act. Until the recent revision of the Marine Protection Act ocean dumping regulations, 42 Fed.Reg. 2462 (1977), the EPA had applied the same set of regulations to outfalls and all ocean dumping under both the Water Act and the Marine Protection Act. The EPA stated that the regulations, as they were directed to outfalls, were based on Section 403, with no mention of the applicability of Section 301. The court also notes an inconsistency in the EPA's argument here that Section 301's secondary treatment requirements apply to the disposal of sludge via ocean outfalls when the EPA has set dates for the cessation of ocean sludge disposal at Hyperion beyond July 1, 1977, the date by which Section 301 mandates the application of secondary treatment.

age outfalls was made by Representative Harold T. Johnson of California, one of the House conferees. Mr. Johnson's understanding of the Water Act clearly regards ocean-discharging sewage plants as subject to the secondary treatment requirements of Section 301.[8] The Senate Report also contains a brief statement that Section 403's requirements apply in addition to the requirements under Title III of the bill (now subchapter III which includes Section 301)[9].

The EPA urges that the wording of the Water Act compels the application of Section 301 to ocean pollution. Section 301(a) states that the discharge of pollutants is unlawful unless in compliance with certain listed sections of the Act. The listed sections do not include Sections 403 and 405, evidence, argues the EPA, that those sections were regarded by the drafters as sup-

plementary rather than primary requirements. The Court also notes that Section 301(e) provides that 301's "Effluent limitations . . . shall be applied to *all* point sources of discharge of pollutants in accordance with the provisions of this chapter." (Emphasis added.) The definitions of "point source" and "discharge of a pollutant" cover the disposal of sludge into the ocean via outfalls or vessels. See Section 502(6), (12), (14), 33 U.S.C. § 1362(6), (12), (14). The Senate Report indicates that the drafters of the Senate bill had outfall discharge specifically in mind when writing Sections 301(e) and 502(12).[10]

At many points, the legislative history of the Water Act indicates Congress' intention that Section 301's effluent limitations apply across-the-board to all sources of pollution covered by the Act.[11] Senator Muskie

---

**8.** Representative Harold T. Johnson made the following remarks at the House consideration of the report of the conference on October 4, 1972:

> "In defining the term 'secondary treatment' . . . the Administrator has the discretion to find that the 'secondary treatment' requirement is met by alternative means. For example, in the case of deep ocean water discharges through ocean outfalls, the Administrator could determine that 'secondary treatment' requirements are met in that situation where the discharges have first, received primary treatment, second, complied with regulations governing the discharge of heavy metals and other toxic substances and, third, where the publicly owned agency has demonstrated that such ocean discharges are not inconsistent with the purposes of the act and do not harm or endanger the diversity, productivity and stability of the marine ecosystem.
>
> It would be wasteful of public funds to define 'secondary treatment' in such a fashion as to require expensive facilities to achieve a degree of treatment which, under the practical circumstances existing, would be unnecessary.
>
> The discretion conferred upon the Administrator should be exercised by him only after he has determined that whatever processes or action constitute 'secondary treatment' conform with and are consistent with the objectives of the act, and that they are technically and economically feasible. Moreover, I believe that any publicly owned system bears the burden of demonstrating to the Administrator that this will be the case."

2 Leg. Hist. at 1266–67.

**9.** "[F]or those classes and categories of point sources which will discharge into the territorial seas, the waters of the contiguous zone and the waters of the ocean. . . . the Administrator [of the EPA] (in addition to requirements under Title III) is required to apply guidelines established by regulation for determining the effect on the territorial sea, the waters of the contiguous zone and the waters of the ocean under Section 403."

S. Rep. No. 92–414, 92d Cong., 1st Sess. (1971), U.S.Code Cong & Admin. News 1972, p. 3738; 2 Leg. Hist. at 1490.

**10.** "The Committee has also added a definition of the term discharge to indicate the scope of the control requirements under the Act. Any pollutant added to the navigable waters from any point source or the addition of any pollutant to the contiguous zone or the water of the ocean by outfall or other pipeline is included within the control requirements of Title III . . . ."

S.Rep.No. 92–414, 92d Cong., 1st Sess. (1971), 2 Leg. Hist. at 1495, U.S.Code Cong. & Admin. News 1972, p. 3743.

**11.** See, e. g., Senator Muskie's remarks that advanced wastewater treatment "will be required for *every* community in the Nation." 1 Leg. Hist. at 165 (emphasis added); the Senate Report's statement that "*All* publicly owned [treatment] facilities must utilize secondary treatment . . . ." 2 Leg. Hist. at 1460 (emphasis added), U.S.Code Cong. & Admin. News 1972, p. 3708; also see the Conference Report's statement on uniformity:

> "Except as provided in Section 301(c) of this Act, the intent of the Conferees is that ef-

summed up the "three essential elements" of the Water Act, differentiating it from past unsuccessful water pollution legislation: "Uniformity, finality, and enforceability." (Senate consideration of the report of the conference committee, October 4, 1972, 1 Leg. Hist. at 162). Under the plaintiffs' interpretations of the relationship between Sections 301 and 403, see n. 4, either industrial point sources and sewage treatment plants discharging pollutants into the ocean would be subject to an entirely different system of regulation from dischargers into inland waters, or deep ocean outfalls would be regulated under an entirely different system from all other sources of pollution covered by the Water Act. Had Congress intended such major distinctions, the Water Act could easily have been drafted to reflect them.

■ The overall policy emphasis of the Water Act is not difficult to discern. The Water Act focuses primarily on the technological control of pollution at its source rather than on the achievement of water quality standards for receiving waters. As described by Mr. Justice White, the Water Act's

> direct restrictions on discharges facilitate enforcement by making it unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated. In addition, a discharger's performance is now measured against strict technology-based effluent limitations—specified levels of treatment—to which it must conform, rather than against limitations derived from water quality standards to which it and other polluters must collectively conform.

*EPA v. State Water Resources Control Board*, 426 U.S. 200, 204–205, 96 S.Ct. 2022, 2024, 48 L.Ed.2d 578 (1976) (footnotes omitted).

fluent limitations applicable to individual point sources within a given category or class be as uniform as possible. The Administrator is expected to be precise in his guidelines under subsection (b) of this section, so as to assure that similar point sources with

■ Surely, when Congress adopted a regulatory philosophy of strict end-of-pipe regulation, if an exception was intended for ocean polluters or deep ocean outfalls such an exception would have been specifically referred to in either the statutory language or the legislative history. The court is satisfied that a reasonable interpretation of the Water Act requires that Section 301 and Section 403 apply *concurrently* to all ocean pollution within the jurisdiction of the Act, i. e., to obtain an NPDES permit an ocean polluter must meet both the technological control requirements of Section 301 and the ocean degradation criteria of Section 403.

■ The court concludes that by Section 301 of the Water Act Congress mandated the application of secondary treatment to sewage plant discharge within the territorial seas or through outfalls. Under the regulations defining secondary treatment, 40 C.F.R. Part 133, sludge is prohibited. Obviously, no EIS is required on the Congressional mandate to require secondary treatment for all sewage plants. Nor is an EIS required for the EPA's issuance of regulations defining secondary treatment because such action is exempt from EIS requirements under Section 511(c) of the Water Act. The court further rules that even if Section 301 were not applicable to ocean pollution, an EIS would still be unnecessary. Plaintiffs concede that Section 403 gives the EPA the *power* to regulate the disposal of pollutants into the territorial seas and from outfalls. Therefore, even if the EPA incorrectly interpreted the Water Act and applied wrong standards to the regulation of ocean pollution under the Water Act, the EPA's decision is still one made "pursuant to" the Water Act and thus within the NEPA exclusion of Section 511(c). The exemption granted by 511(c) would have little effectiveness if every time the EPA is alleged to have abused its dis-

similar characteristics, regardless of their location or the nature of the water into which the discharge is made, will meet similar effluent limitations."

1 Leg. Hist. at 309, U.S.Code Cong. & Admin. News 1972, p. 3803.

cretion in administering the Water Act or to have incorrectly interpreted the law, the EPA's action would lose its Section 511(c) exemption. To correct abuses of discretion and misapplication of Water Act provisions, review procedures exist under the Water Act, 33 U.S.C. §§ 1365, 1369, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Direct review of the EPA's alleged mistakes in administering the Water Act is much more appropriate than indirect review under the guise of an EIS.

■ Plaintiffs finally argue that Section 511(c)'s exemption from NEPA's EIS requirements cannot entirely insulate a national no-sludge-in-the-ocean policy because that policy covers matters beyond the scope of the Water Act, specifically the dumping of sludge from vessels beyond the territorial seas. The instant motion seeks injunctive relief against EPA Water Act orders concerning discharge through ocean outfalls. Since no injunctive relief is sought against any order under the Marine Protec-

tion Act prohibiting vessel dumping of sludge into the open seas, a national policy prohibiting such dumping is only relevant to this litigation because the EPA has refused to consider vessel dumping of sludge as an alternative to outfall discharge of sludge prohibited by the EPA in enforcing the Water Act. In this limited context, the court concludes that the EPA is not required to consider deep ocean vessel dumping as an alternative to land disposal of Hyperion's sludge. Having so concluded, the second cause of action seeking an EIS on the national no-sludge-in-the-ocean policy has no further relevance to this motion.[12]

■ To effectively implement Congressional policies, application of the Water Act and the Marine Protection Act must be harmonized. Legislative history indicates that Congress intended the two acts to operate as a comprehensive, long-range regulatory scheme aimed at eventually ending all water pollution.[13] Between the Marine

12. The court is not entirely unsympathetic to plaintiffs' dissatisfaction with an EIS on the Hyperion project that only considers land-based environmental effects, but the court is persuaded that Congress intended to free the EPA from the burden of reconsidering and reevaluating all of its water quality mandates and policies each time it prepares an EIS for a sewage treatment plant grant.

Senator Buckley, at the Senate consideration of the Conference Report, October 4, 1972, objected to the scope of Section 511(c) because he foresaw that the reexamination of the EPA's general standards and guidelines would not be required in preparing an EIS under the Water Act. Speaking of the EIS requirement for new sources of pollution, Buckley noted that "under Section 511(c)(2) the only issue left for exploration in the impact statement in such cases would apparently be non-water quality considerations." 1 Leg. Hist. at 195.

13. "The framework [of Sections 301, 402, and 403 of the Water Act] is in concert with the ultimate objective of the Act to eliminate the discharge of pollutants.

The Committee [on Public Works] shares equally jurisdiction with the Senate Commerce Committee over the disposal of pollutants from vessels beyond the territorial seas. . . . Both committees have held hearings on the subject of ocean degradation. There can be no doubt that there is presently serious deficiency that exists in present law that

must be repaired if this Nation is to lead in the protecting the quality of the ocean.

In order to expedite the legislative process, the Committee on Public Works and the Committee on Commerce have jointly agreed on a bill to provide the regulatory framework to control the dumping of pollutants from vessels into the waters beyond the territorial seas.

 *   *   *   *   *   *

Coupled with the provisions in the bill reported by the Committee on Public Works [the Water Act], the bill to be reported from the Commerce Committee [the Marine Protection Act] should enable the United States to have complete and integrated regulation of the disposal of pollutants into all waters and over all sources of pollutants subject to its jurisdiction. It is expected that the leadership so exercised by the United States will be the model for other nations and should in a short time produce the framework for international agreement over the protection of the oceans.

 *   *   *   *   *   *

The ocean's waters are in constant circulation, so that any discharge beyond any arbitrary limit, such as 3 or 12 miles, may reach the beaches of the United States. Thus, in considering the discharge effects, the Administrator [of the EPA] must consider the effect that the discharge may have elsewhere on the integrity of the marine systems.

 . . . [T]he Committee wishes to emphasize the need to preserve the ocean in as

Protection Act and the Water Act, the EPA is given the authority, to the full extent of the jurisdiction of the United States, to regulate and ultimately to eliminate pollution of the oceans. Given the Marine Protection Act's stated purpose of encouraging the development of "means of minimizing or *ending* all dumping of materials within five years of the effective date of this Act [April 23, 1973]," 33 U.S.C. § 1443 (emphasis added), it is difficult to say that the Marine Protection Act provides no basis for an EPA policy against dumping of sludge into the deep oceans. It would mock Congress' long-range comprehensive goal of water quality improvement to require the EPA to order the cessation of sludge disposal from a deep ocean outfall while requiring the EPA to consider, as an alternative disposal method, the dumping of this same sludge by vessel into the deep ocean at the pipe's end or at any other place on the face of the waters. Congress' desire to restore and maintain the integrity of all waters over which this nation has jurisdiction was the moving spirit behind the Water Act and the Marine Protection Act. That spirit directs that as long as there exists a practical land disposal method, the EPA need not evaluate the alternative of deep ocean dumping when it formulates conditions for an NPDES permit or when it authorizes a grant of federal funds to develop a project designed to achieve compliance with the Water Act.

The Clerk of the Court shall serve copies of this Memorandum and Order, by United States mail, upon the attorneys of record for the parties appearing in this cause.

---

natural a state as possible at least until we understand its tolerances and characteristics, so that discharges permitted today will not irreversibly modify the oceans for future uses."

S. Rep. No. 92–414, 92d Cong., 1st Sess. (1971), U.S.Code Cong. & Admin. News 1972, p. 3740; 2 Leg. Hist. at 1492–93.