IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

SAN CARLOS APACHE TRIBE,
*Appellant,*

*v.*

STATE OF ARIZONA; ARIZONA WATER QUALITY APPEALS BOARD;
ARIZONA DEPARTMENT OF ENVIRONMENTAL QUALITY,
*Appellees.*

RESOLUTION COPPER MINING, LLC,
*Intervenor/Appellee.*

No. CV-22-0290-PR
**Filed June 27, 2024**

Appeal from the Superior Court in Maricopa County
The Honorable Sigmund G. Popko, Judge Pro Tempore
No. LC2019-000264-001
**AFFIRMED**

Opinion of the Court of Appeals, Division One
254 Ariz. 179 (2022)
**VACATED IN PART**

COUNSEL:

Christopher D. Thomas (argued), Diane M. Johnsen, Andrea J. Driggs, Janet M. Howe, Perkins Coie LLP, Phoenix, Attorneys for Resolution Copper Mining, LLC

Kristin K. Mayes, Attorney General, Jeffrey D. Cantrell (argued), Assistant Attorney General, Arizona Attorney General's Office, Phoenix, Attorneys for Arizona Department of Environmental Quality

Alexander B. Ritchie, Justine Jimmie, Department of Justice, San Carlos Apache Tribe; Bernardo M. Velasco (argued), Jana L. Sutton, Mesch Clark Rothschild, Tucson, Attorneys for San Carlos Apache Tribe

Brian A. Cabianca, Squire Patton Boggs (US) LLP, Phoenix, Attorney for Amici Curiae American Exploration and Mining Association, National Mining Association, Arizona Mining Association, and Montana Mining Association

---

JUSTICE KING authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, LOPEZ, BEENE, and MONTGOMERY joined.

---

JUSTICE KING, Opinion of the Court:

¶1 Copper mining began at the Magma Copper Mine near Superior, Arizona, over a century ago. In 1975, the United States Environmental Protection Agency (the "EPA") issued the mine its first permit authorizing the discharge of water pursuant to the Clean Water Act, 33 U.S.C. §§ 1251–1389 (the "CWA"). *See* 33 U.S.C. § 1342(a) (tasking the EPA with administering the National Pollutant Discharge Elimination System ("NPDES") permit program, which includes issuing permits that authorize the discharge of pollutants when certain conditions are met). The EPA later renewed the mine's discharge permit every five to eight years.

¶2 In 2002, the EPA delegated its administrative authority over the CWA permit program to the Arizona Department of Environmental Quality ("ADEQ"). *See* Approval of Application by Arizona to Administer the NPDES Program, 67 Fed. Reg. 79629, 79630 (Dec. 30, 2002); A.R.S. §§ 49-255 to -265. Thereafter, ADEQ periodically renewed the mine's permit, as required by the CWA.

¶3 In 2014, the mine's owner, Resolution Copper Mining, LLC ("Resolution"), completed construction of a new mine shaft ("Shaft 10").

Shaft 10 is a vertical excavation about thirty feet wide that descends nearly 7,000 feet underground.   The issue before us is whether Shaft 10 is a "new source" under the CWA.   A "new source" is subject to the generally more stringent new source performance standards under § 306 of the CWA, 33 U.S.C. § 1316.   Based on the record before us, we conclude that the sinking of Shaft 10 did not create a "new source" under the CWA.   Thus, ADEQ acted within its discretion when it issued the discharge permit renewal to Resolution in 2017.

## I.   BACKGROUND

### A.  History And Development Of The Mine

¶4        In 1910–1911, Magma Copper Company ("Magma") purchased and began developing the mine to extract copper ore.   Part of Magma's development included deepening an existing mine shaft (Shaft 1) and constructing other underground workings, including additional mine shafts (Shafts 2 through 8).   A "shaft is the surface opening to the mine which provides a means of entry to or exit from the mine for men and materials, and for the removal of ore or waste from underground to the surface.   It may be vertical or inclined."   *See* EPA, *Development Document for Final Effluent Limitations Guidelines and New Source Performance Standards for the Ore Mining and Dressing Point Source Category* ("*Development Document*") 29–30 (Nov. 1982), https://www.epa.gov/sites/default/files/2015-10/documents/ore-mining_dd_1982.pdf.   The mine shafts were used for a variety of purposes, including the removal of water to keep the mine workings dry (a process known as dewatering) and ventilating and improving air quality below the surface of the mine.   Magma also installed equipment at the mine, such as a local concentrator to process ore and a smelter.   In addition, the mining operation included underground tunnels that connected the shafts and facilitated ore extraction.

¶5        The development of a mine may expand as new ore deposits are located.   In this case, as active extraction depleted copper ore in the original area, Magma turned its attention to other exploratory efforts.   New copper-ore deposits were discovered, and Magma's operations consequently expanded in an eastward direction.

¶6        In 1971, Magma constructed Shaft 9 on non-contiguous property located approximately two miles east of the original workings of

the mine.    The purpose of Shaft 9 was to identify copper-ore bodies within that area and improve access to ore.

¶7        Magma also constructed an underground tunnel extending about two miles in length that connected the eastern portion of the mine (including Shaft 9) with the western portion.    This tunnel was known as the "Never Sweat Tunnel."    Magma used the Never Sweat Tunnel to transport copper ore from Shaft 9 to the western portion of the mine, where extracted ore was processed and stored.

¶8        As mining operations continued depleting copper ore, Magma began drilling underground exploratory holes in an effort to locate new ore.    Magma discovered some new copper ore near Shaft 9 but ceased further exploratory drilling in 1982.    With no operating pumps, Magma allowed the underground workings to flood with infiltrating groundwater.

¶9        In 1989, Magma began the process of dewatering the mine. Magma also resumed ore production and underground exploratory drilling.    The results of the exploratory drilling suggested the possibility of undiscovered copper.    In 1994–1995, Magma discovered a new, large copper-ore body beneath the eastern portion of the mine (the "Eastern Deposit").    Magma, however, did not extract copper ore from the Eastern Deposit at that time.

¶10       In 1996, a new entity, Broken Hill Proprietary Company Ltd. ("BHP"), acquired the mine, forming a wholly owned subsidiary, BHP Copper, Inc. ("BHP Copper").    BHP Copper continued mining operations from Shaft 9, depleting the remaining reserves in that area.    BHP Copper ceased mining operations but continued exploration efforts by drilling deep holes in the area of the Eastern Deposit.    In 1998, BHP Copper ceased all operations and turned off its dewatering pumps, allowing the mine's underground workings to flood with water.    In addition, some of the underground workings at the mine were backfilled.

¶11       In 2001, BHP entered into an exploration agreement with an entity that was a wholly owned subsidiary of Rio Tinto (collectively "Rio Tinto").    Thereafter, Rio Tinto commenced a deep exploratory drilling program focused on outlining the Eastern Deposit.

¶12       In 2004, Rio Tinto acquired a majority interest in the mine.

Rio Tinto then formed Resolution as a joint venture with BHP's successor, BHP Billiton, to continue efforts aimed at extracting copper ore from the Eastern Deposit. Beginning in 2005, Resolution resumed exploratory drilling and conducted a study to assess viable methods of extracting copper ore from the Eastern Deposit. Resolution also decided to construct a new mine shaft and other support structures that would enable it to access and study the Eastern Deposit. Through years of exploration efforts, it was determined that the Eastern Deposit begins around 4,500 feet below ground surface level and proceeds down to about 7,000 feet. It covers an area of about one square mile, and the ore body is approximately 1,600 feet in thickness.

**¶13** From 2007 to 2009, Resolution began developing and sinking Shaft 10. Shaft 10 is located about 300 feet from Shaft 9 in the eastern portion of the mine. Shaft 10 descends nearly 7,000 feet underground; in contrast, Shaft 9 descends roughly 5,000 feet. Shaft 10 is not drilled directly into the Eastern Deposit. In 2014, Resolution completed construction of Shaft 10 and its surface components, including a hoist and structural supports that enable the transport of supplies to and from the base of Shaft 10.

**¶14** During Shaft 10's construction, Shaft 9 was used for support purposes (e.g., ventilation and dewatering underground mine workings). Resolution plans to continue to use Shaft 9 for support but not for ore extraction.[1]

**¶15** Around the time of Shaft 10's construction, Resolution performed other work at the mine: (1) rehabilitating and extending the Never Sweat Tunnel; and (2) constructing a new cooling tower, additional rock stockpiles, wash bays, and a mine water treatment plant.[2] Resolution used the Never Sweat Tunnel to transport development rock from its activities to the western portion of the mine for storage and future processing. Shaft 9 and the eastern portion of the mine remain connected with the western portion of the mine via the Never Sweat Tunnel.

---

[1] Resolution plans to extend Shaft 9 to about the same depth as Shaft 10 at some point.

[2] Resolution also has plans to build a concentrator at the western portion of the mine, as well as another tunnel connecting the western and eastern portions of the mine.

¶16        Resolution uses Shaft 10 to explore and study the Eastern Deposit, ventilate and dewater the underground workings, and transport supplies. Shaft 10 also provides another point of entry and exit for individuals working at the mine. Resolution has not used Shaft 10 or other new features for the commercial extraction of copper ore from the Eastern Deposit. Resolution uses preexisting infrastructure at the mine to support Shaft 10's functions. Resolution's operation requires it to control stormwater and other water used in the mining process, as well as remove groundwater from the underground workings of the mine through dewatering. To accomplish this, Resolution drains water from Shaft 9 to the base of Shaft 10 and then pumps the water up to and through the Never Sweat Tunnel to the western portion of the mine. From there, it is combined with water that has been collected from Shaft 8, which is used to dewater the western portion of the mine. Then, Resolution sends all combined water west to the water treatment plant for treatment and storage.[3]

¶17        According to Resolution's General Plan of Operations, after water is treated at the water treatment plant, Resolution will attempt to reuse the water internally for ore processing, dust suppression, equipment washing, drinking water, cooling, or fire protection. In the event of excess treated water, Resolution has a contract with the New Magma Irrigation and Drainage District, thirty miles southwest of the mine, to pipe that water to the irrigation district. If the irrigation district does not have capacity, Resolution is authorized to pipe the treated water into a tributary that flows into Queen Creek. To date, however, Resolution has not discharged any water into Queen Creek; instead, it has sent all excess treated water to the irrigation district. Although circumstances could change, Resolution intends to continue sending its treated water to the irrigation district, rather than discharging it into Queen Creek.

¶18        Many of the originally constructed shafts and tunnels are no

---

[3] Resolution also captures stormwater runoff using a channeling system that diverts the water to a specific area. From there, it can be pumped to another location for evaporation or to the water treatment plant. The main source of water sent to the water treatment plant is from dewatering the underground mine workings, but small volumes of industrial water and stormwater are sent as well.

longer in operation or accessible. But Shaft 6 is used to ventilate the Never Sweat Tunnel. And, as noted, Shafts 8 and 9 and the Never Sweat Tunnel remain in use, and Resolution plans to continue their use. Resolution may use other preexisting shafts in the future, but not other tunnels.

¶19     Resolution's plan is to access the Eastern Deposit using a technique called panel caving. This method involves cutting the rock underneath the ore deposit, removing its ability to support the overlying rock material and causing it to collapse into a collection zone. As the ore is extracted from the bottom of the mine, the deposit will continue to collapse in on itself, thereby continuing to replenish the extractable ore. Occurring entirely underground, a series of conveyors, rail lines, tunnels, hoists, and other equipment will then transport the ore from beneath the deposit up and to the western portion of the mine for storage and processing. This method differs from that previously implemented at the mine through the use of adits and tunnels. *See Development Document*, *supra*, at 29–30 (describing an "adit" as a "passageway or opening driven horizontally into the side of a hill generally for the purpose of exploring or otherwise opening a mineral deposit," and it "is open to the atmosphere at one end"); *see also Development Document*, *supra*, at 557.

## B.  The Distinction Between A "New Source" And "Existing Source"

¶20     We must determine whether Resolution's sinking of Shaft 10 created a "new source" under the CWA. The CWA treats "new sources" differently from "existing sources." *See* 40 C.F.R. § 122.29(a)(3) ("Existing source means any source which is not a new source or a new discharger."). A "new source" is subject to the CWA's new source performance standards. *See* 33 U.S.C. § 1316(a)(1) (defining "standard of performance" as "a standard for the control of the discharge of pollutants which reflects the greatest degree of effluent reduction which [the EPA] determines to be achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants"); *see also* Ore Mining and Dressing Point Source Category Effluent Limitations Guidelines and New Source Performance Standards, 47 Fed. Reg. 54598–600 (Dec. 3, 1982) (referring to the standards as "new source performance standards").

¶21     "The classification of a facility as a new or existing source is

7

important because under the CWA existing sources are subject to best available technology (BAT) and best conventional technology (BCT) requirements, while new sources are subject to the generally more stringent new source performance standards . . . under section 306 of the CWA." NPDES Permit Regulations, 49 Fed. Reg. 37998, 38043 (Sept. 26, 1984). The distinction between a "new source" and an "existing source" "is based on the concept that new facilities have the opportunity to install the best and most efficient production processes and wastewater treatment technologies." *Id.*

## C. Water Discharge Permits

**¶22**　　　　Since the CWA began requiring discharge permits, all past and present owners of the mine have obtained the necessary permit and permit renewals to discharge water from the mine. The permit renewal at issue here is the "Authorization to Discharge under the Arizona Pollutant Discharge Elimination System," which ADEQ issued to Resolution on January 19, 2017 (Permit No. AZ0020389) (the "2017 Permit Renewal"). The 2017 Permit Renewal became effective on January 23, 2017 and expired on January 22, 2022.

**¶23**　　　　The 2017 Permit Renewal subjected Resolution to certain requirements for purposes of complying with the CWA's water quality standards. If Resolution complied with such requirements, the 2017 Permit Renewal authorized Resolution

> to discharge mine site stormwater runoff from Outfall 001 and treated mine water, industrial water and seepage pumping from Outfall 002 from the Superior Operations in Pinal County, Arizona to an unnamed wash, tributary to Queen Creek in the Middle Gila River Basin . . . in accordance with discharge limitations, monitoring requirements and other conditions set forth herein, and in the attached "Standard [Arizona Pollutant Discharge Elimination System] Permit Conditions."

**¶24**　　　　As noted, the 2017 Permit Renewal authorized the discharge of waters "to an unnamed wash, tributary to Queen Creek in the Middle Gila River Basin." Queen Creek has been designated an "impaired waterway" due to the levels of copper present in it. *See* 33 U.S.C.

§ 1313(d)(1)(C) (requiring states to identify waters that do not meet water quality standards and establish for those waters a "total maximum daily load . . . at a level necessary to implement the applicable water quality standards"); *see also* 40 C.F.R. § 131.31(b); Ariz. Admin. Code tit. 18, ch. 11, art. 1, app. B. ADEQ's 2017 Permit Renewal subjected Resolution to effluent limitations for copper that are more stringent than federal new source performance standards for copper. *See* 40 C.F.R. § 440.104.

**D. Procedural History**

¶25 The San Carlos Apache Tribe (the "Tribe") challenged ADEQ's issuance of the 2017 Permit Renewal with the Arizona Water Quality Appeals Board (the "Board"). The Tribe claimed that the construction of Shaft 10 and other new features created a "new source," 40 C.F.R. §§ 122.2, 122.29(b), rather than an "existing source," 40 C.F.R. § 122.29(a)(3), under the CWA. The Tribe maintained that, as a "new source," Shaft 10 needed to satisfy additional provisions of the CWA before ADEQ could properly issue a permit renewal.

¶26 An administrative law judge ("ALJ") from the office of administrative hearings conducted a seven-day hearing and issued findings of fact and conclusions of law. The ALJ determined that ADEQ generally did not act arbitrarily and capriciously when it issued the 2017 Permit Renewal, but ADEQ should have first analyzed whether Shaft 10 and the other new features were a "new source" under § 122.29(b). The ALJ, therefore, concluded that "the matter should be remanded to ADEQ to allow it to conduct an analysis as required by 40 C.F.R. § 122.29(b)."

¶27 In response to the ALJ's decision, the Board entered an order remanding the matter to ADEQ to conduct a "new source" analysis. ADEQ did so and concluded that Shaft 10 and the new features were "existing sources" (not "new sources") under the CWA. The Board issued a final administrative decision, which adopted all the ALJ's findings of fact and affirmed ADEQ's issuance of the 2017 Permit Renewal.

¶28 The Tribe appealed the Board's decision to the superior court under A.R.S. § 12-905. The superior court affirmed the Board's decision, concluding that Shaft 10 and the new features did not constitute a "new source" under the CWA.

**¶29** The court of appeals reversed the superior court in a split opinion. *San Carlos Apache Tribe v. State*, 254 Ariz. 179, 193 ¶ 61, 195 ¶ 72 (App. 2022). The majority concluded that "[t]he CWA treats the new mine shaft as a 'new source' because it is substantially independent of the non-contiguous original deposit at the mining site." *Id.* at 183 ¶ 1. Thus, Shaft 10 "is a new source and Resolution's mining site is subject to [new source performance standards] under 40 C.F.R. § 440.104(a)." *Id.* at 193 ¶ 61. The majority also determined that because Shaft 10 is a "new source" and Queen Creek is an "impaired waterway," ADEQ may not renew Resolution's discharge permit until (1) ADEQ finalizes a total maximum daily load plan for Resolution's discharge of water into Queen Creek, and (2) Resolution demonstrates other requirements prescribed in 40 C.F.R. § 122.4(i). *Id.* at 183 ¶¶ 2, 4, 193 ¶¶ 62–63.

**¶30** The dissent disagreed with the order in which the majority approached the CWA regulations for the "new source" determination, explaining that the regulations should be evaluated "in the order they are presented in the text of the regulation." *Id.* at 197–98 ¶¶ 74–76 (Paton, J., dissenting). Conducting the analysis in that order, the dissent concluded that "Shaft 10 is not a new source that would require ADEQ to issue [a total maximum daily load plan] before permitting discharge from Shaft 10." *Id.* at 202 ¶ 99.

**¶31** We granted review because this case presents an issue of statewide importance. Although the 2017 Permit Renewal has expired, the issue presented is one that is likely to arise again and evade review. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## II. DISCUSSION

**¶32** "We interpret statutes and administrative rules de novo, 'apply[ing] the same rules in construing both statutes and rules.'" *Saguaro Healing LLC v. State*, 249 Ariz. 362, 364 ¶ 10 (2020) (alteration in original) (quoting *Gutierrez v. Indus. Comm'n*, 226 Ariz. 395, 396 ¶ 5 (2011)). "We do not defer to the agency's interpretation of a rule or statute." *Id.* We "affirm the agency action unless the court concludes that the agency's action is contrary to law, is not supported by substantial evidence, is arbitrary and capricious or is an abuse of discretion." A.R.S. § 12-910(F).

## A. What Is The Test For Determining Whether A Construction Is A "New Source" Under The CWA?

**¶33** In 1972, Congress passed the CWA with the "objective . . . to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the "addition of any pollutant to navigable waters from any point source" without a permit. 33 U.S.C. § 1362(12)(A); *see also* 33 U.S.C. § 1311(a); 40 C.F.R. § 122.1(b)(1). The CWA also requires the EPA to establish "standards of performance" for "new sources" from which there are or may be discharges of pollutants for certain industries. 33 U.S.C. § 1316(b)(1)(B).

**¶34** The Tribe claims that Shaft 10 is a "new source" under the CWA. According to the Tribe, this designation matters because Queen Creek is an "impaired waterway" and the CWA regulations provide:

> No permit may be issued . . . [t]o a new source . . . if the discharge from its construction or operation will cause or contribute to the violation of water quality standards. The owner or operator of a new source . . . proposing to discharge into a water segment which does not meet applicable water quality standards or is not expected to meet those standards even after the application of the effluent limitations required by . . . [the] CWA, and for which the State or interstate agency has performed a pollutants load allocation for the pollutant to be discharged, must demonstrate . . . that: (1) There are sufficient remaining pollutant load allocations to allow for the discharge; and (2) The existing dischargers into that segment are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards.

40 C.F.R. § 122.4(i). The Tribe maintains that the 2017 Permit Renewal was improper because ADEQ issued it before a copper total maximum daily load for Queen Creek was finalized and before Resolution met its burden under § 122.4(i)(1) and (2). Conversely, Resolution and ADEQ contend that Shaft 10 is not a "new source" that would trigger these requirements, and therefore ADEQ properly issued the 2017 Permit Renewal.

**¶35** At the outset, we must determine the proper framework for

11

determining whether a construction is a "new source" under the CWA.[4] Section 122.29(b) provides the "[c]riteria for new source determination." We agree with the court of appeals' dissent that we should "approach the CWA regulations in the order they are presented in the text of the regulation." *San Carlos Apache Tribe*, 254 Ariz. at 197 ¶ 74; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) (discussing the "whole-text canon" that "calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts").

**¶36** Section 122.29(b)(1) begins: "Except as otherwise provided in an applicable new source performance standard, a source is a 'new source' if it meets the definition of 'new source' in § 122.2." *See also* 40 C.F.R. § 122.29(a)(1) (providing that "[n]ew source" is "defined in § 122.2"). Therefore, the test *first* examines the definition of "new source" in § 122.2, which states:

> New source means any building, structure, facility, or installation from which there is or may be a "discharge of pollutants," the construction of which commenced: (a) After promulgation of standards of performance under section 306 of CWA which are applicable to such source, or (b) After proposal of standards of performance in accordance with section 306 of CWA which are applicable to such source, but only if the standards are promulgated in accordance with section 306 within 120 days of their proposal.

*See also* 33 U.S.C. § 1316(a)(3) (defining "source" as "any building, structure, facility, or installation from which there is or may be the discharge of

---

[4] The federal CWA statutes and regulations at issue here may have a corresponding state statute or regulation due to implementation of the Arizona Pollutant Discharge Elimination System Program. *See, e.g.*, Ariz. Admin. Code R18-9-A905(A)(1)(e) (incorporating by reference 40 C.F.R. § 122.29 ("New sources and new dischargers") for the Arizona Program Standards). In this Court, however, the parties exclusively relied upon federal statutes and regulations rather than citing any corresponding state statute or regulation. Thus, we cite to the federal provisions. No party has challenged the validity, enforceability, or applicability of the CWA regulations.

pollutants"); 40 C.F.R. § 122.29(a)(2) (same); 33 U.S.C. § 1316(a)(2) ("The term 'new source' means any source, the construction of which is commenced after the publication of proposed regulations prescribing a standard of performance under this section which will be applicable to such source, if such standard is thereafter promulgated in accordance with this section.").

¶37        If that provision is satisfied, § 122.29(b)(1) instructs that we *next* evaluate the three criteria in § 122.29(b)(1)(i)–(iii):

> [A] source is a "new source" if it meets the definition of "new source" in § 122.2, *and* (i) It is constructed at a site at which no other source is located; or (ii) It totally replaces the process or production equipment that causes the discharge of pollutants at an existing source; or (iii) Its processes are substantially independent of an existing source at the same site.

40 C.F.R. § 122.29(b)(1) (emphasis added); *see also Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 568 (D.C. Cir. 2002) (explaining that the new source performance standards apply "only to sources that meet the 'new source' definition in 40 C.F.R. § 122.2, *as well as* one of the following three criteria" in § 122.29(b)(1)(i)–(iii)).

¶38        If those provisions are satisfied, the "new source" test concludes with an evaluation of § 122.29(b)(2): "A source meeting the requirements of paragraphs (b)(1)(i), (ii), or (iii) of this section is a new source only if a new source performance standard is independently applicable to it.   If there is no such independently applicable standard, the source is a new discharger.   See § 122.2."[5]

¶39        The "new source" test, therefore, begins with the broadest criteria—identifying both the general physical characteristics of the construction (whether it is a "building, structure, facility, or installation")

---

[5]  As the ALJ noted, the Tribe originally contended Resolution developed a "new discharger" but later withdrew that allegation and presented no substantial evidence on the issue.   We were not asked to determine whether Shaft 10 is a "new discharger" under the CWA, *see, e.g.*, 40 C.F.R. § 122.2 (providing a definition of "new discharger").   We therefore do not address that issue or any requirement applicable to a "new discharger."

and when its construction commenced. *See* 40 C.F.R. §§ 122.2, 122.29(b)(1). The test then evaluates additional criteria that are narrower in scope (e.g., the source's relationship with other features where the source is located). *See* 40 C.F.R. § 122.29(b)(1)(i)–(iii), (b)(2). *See also Nat'l Wildlife Fed'n*, 286 F.3d at 568 ("If new construction does not satisfy 40 C.F.R. § 122.2 *and* one of the three criteria set forth in 40 C.F.R. § 122.29(b)(1), then the construction is generally classified as a 'modification' and is not subject to the [new source performance standards].").

¶40        Accordingly, the following three-step test should be used to determine whether a construction is a "new source" under the CWA:

1. Step One: Does the construction meet the definition of "new source" under 40 C.F.R. § 122.2?    40 C.F.R. § 122.29(b)(1); *see also* 33 U.S.C. § 1316(a)(2), (3).

   a. Has there been a construction of a building, structure, facility, or installation from which there is or may be the discharge of pollutants?    40 C.F.R. § 122.2; *see also* 33 U.S.C. § 1316(a)(3); 40 C.F.R. § 122.29(a)(2).

   b. Has construction commenced?    40 C.F.R. § 122.2; *see also* 33 U.S.C. § 1316(a)(2).

   c. Did construction commence after the promulgation (or proposal) of standards of performance under section 306 of the CWA that are applicable to such source?    40 C.F.R. § 122.2; *see also* 33 U.S.C. § 1316(a)(2).

   If the answer to any subpart is no, the construction is not a new source.

2. Step Two: If the answer to all subparts of step one is yes, does the construction meet any of the following definitions of a "new source" in 40 C.F.R. § 122.29(b)(1)?

   a. Is the construction at a site at which no other source is located?    40 C.F.R. § 122.29(b)(1)(i).

   b. Does the construction totally replace the process or

production equipment that causes the discharge of pollutants at an existing source? 40 C.F.R. § 122.29(b)(1)(ii).

c. Are its processes substantially independent of an existing source at the same site? 40 C.F.R. § 122.29(b)(1)(iii).

If the answer to all subparts is no, the construction is not a new source.

3. <u>Step Three</u>: If the answer to all subparts of step one and any subpart of step two is yes, is there a new source performance standard that is "independently applicable" to the source? 40 C.F.R. § 122.29(b)(2).

a. If yes, the source is a new source. *Id.*

b. If no, the source is not a new source. *Id.*

This three-step test is consistent with the text and sequence of the "criteria for new source determination" expressly set forth in § 122.29(b). *See, e.g., Nat'l Wildlife Fed'n*, 286 F.3d at 568.

**B. Is Shaft 10 A "New Source" Under The Three-Step Test?**

¶41 We must now apply the three-step test to determine whether Shaft 10 is a "new source" under the CWA.

1. <u>Step One</u>

a. *Is Shaft 10 a building, structure, facility, or installation from which there is or may be a discharge of pollutants?*

¶42 The Board found that Shaft 10 and other mine features are "facilities" under § 122.2. In this Court, the parties do not dispute that Shaft 10 is a "building, structure, facility, or installation from which there is or may be a 'discharge of pollutants.'" *See* 40 C.F.R. § 122.2; *see also* 33 U.S.C. § 1316(a)(3); 40 C.F.R. § 122.29(a)(2). Copper effluent is a pollutant under the CWA. 40 C.F.R. § 401.15(22).

*b. Has construction of Shaft 10 commenced?*

**¶43**     It is undisputed that construction of Shaft 10 has commenced. *See* 40 C.F.R. § 122.2; *see also* 33 U.S.C. § 1316(a)(2).

*c. What was the timing of Shaft 10's construction?*

**¶44**     The final issue at step one is whether the construction of Shaft 10 commenced after the promulgation (or proposal) of standards of performance under "section 306 of CWA which are applicable to such source."    *See* 40 C.F.R. § 122.2; *see also* 33 U.S.C. § 1316(a)(2).

**¶45**     We begin by determining the meaning of "applicable to such source"—does "such source" refer to the mine or to the new construction at issue?    We do not interpret this specific text in isolation, but instead read it within the context of the CWA "new source" criteria.    *See Columbus Life Ins. v. Wilmington Tr., N.A.*, 255 Ariz. 382, 385 ¶ 11 (2023) (stating that we "determine the plain meaning of the words the legislature chose to use, viewed in their broader statutory context"); *Silver v. Pueblo Del Sol Water Co.*, 244 Ariz. 553, 558 ¶ 16 (2018) ("We interpret agency regulations according to principles of statutory construction."); *see also* Scalia & Garner, *supra*, at 167 (explaining that courts must interpret a statute's plain language in context because "[c]ontext is a primary determinant of meaning").

**¶46**     There are noteworthy differences in the text of the "new source" criteria that assist in our interpretation.    Step one considers whether new source performance standards "are *applicable* to such source." *See* 40 C.F.R. § 122.2 (emphasis added); *see also* 33 U.S.C. § 1316(a)(2).    Step three provides that "[a] source . . . is a new source only if a new source performance standard is *independently applicable* to it."    40 C.F.R. § 122.29(b)(2) (emphasis added).    We cannot ignore the text of "independently applicable" at step three when determining the meaning of "applicable" at step one.    *See Columbus Life Ins.*, 255 Ariz. at 385 ¶ 11 (noting "we view 'the statute as a whole' to 'give meaningful operation to all of its provisions'" (quoting *Wyatt v. Wehmueller*, 167 Ariz. 281, 284 (1991))); *Silver*, 244 Ariz. at 558 ¶ 16.

**¶47**     This textual distinction reveals that "applicable to such source" at step one addresses whether a new source performance standard

is applicable to the mine. And "independently applicable to" the source at step three addresses whether a new source performance standard applies independently to the shaft. This interpretation gives meaning to each term and ensures that the criteria in step one and step three are not redundant. *See State v. Eddington*, 228 Ariz. 361, 363 ¶ 9 (2011) ("[I]f the terms mean the same thing, then one subsection is redundant, and we generally construe statutes so that no part is rendered redundant or meaningless."); *see also* Scalia & Garner, *supra*, at 174 (stating that no provision "should needlessly be given an interpretation that causes it to duplicate another provision or have no consequence").

¶48 Moreover, this interpretation that step one addresses general applicability to the mine is consistent with the fact that the "new source" test begins with the broadest criteria at step one. *See* Part II(A) ¶ 39. The subsequent steps evaluate criteria that are narrower in scope. *Id.*

¶49 Next, we must identify (1) when the construction of Shaft 10 commenced, and (2) when the new source performance standards were promulgated that would be applicable to Shaft 10 as part of the regulated copper mine. *See* 40 C.F.R. § 122.2; 33 U.S.C. § 1316(a)(2). And finally, we must determine whether the construction of Shaft 10 commenced after the promulgation of the new source performance standards that would be applicable to Shaft 10 as part of the regulated copper mine. *Id.*

¶50 Resolution began developing and sinking Shaft 10 between 2007 and 2009. The EPA promulgated the new source performance standards for the Ore Mining and Dressing Point Source Category on December 3, 1982. *See* Ore Mining and Dressing Point Source Category Effluent Limitations Guidelines and New Source Performance Standards, 47 Fed. Reg. at 54598–621; *see also* 40 C.F.R. § 440.100(a)(1) (stating that provisions in Subpart J of Part 440 for Ore Mining and Dressing Point Source Category are applicable to "discharges from . . . [m]ines that produce copper" by "open-pit or underground operations"); 40 C.F.R. §§ 440.100 to .105 (providing effluent limitation guidelines for certain mines and mills). [6] The construction of Shaft 10 commenced after the promulgation of new source performance standards that are applicable to

---

[6] At step one, we do not determine whether Shaft 10 is itself a "mine" because new source performance standards are applicable to copper mines in Subpart J, 40 C.F.R. §§ 440.100 to .105.

Shaft 10 as part of the regulated copper mine. Therefore, step one of the "new source" test is met.

### 2. Step Two

**¶51** In order to meet step two, one of the three criteria in § 122.29(b)(1)(i)–(iii) must apply to Shaft 10. Here, we only consider the applicability of one subsection: § 122.29(b)(1)(iii) (evaluating whether "[i]ts processes are substantially independent of an existing source at the same site"). We accepted review on § 122.29(b)(1)(iii), which was presented in ADEQ's petition for review. Further, the Tribe's briefing in this Court focused on whether Shaft 10 met the criteria in § 122.29(b)(1)(iii). The Tribe did not develop an argument under § 122.29(b)(1)(i) or (ii). Accordingly, we decline to consider whether § 122.29(b)(1)(i) or (ii) are satisfied. *See State v. Johnson*, 247 Ariz. 166, 180 ¶ 13 (2019) (declining to consider an argument that a party failed to develop).[7]

**¶52** Section 122.29(b)(1)(iii) requires us to determine whether Shaft 10's "processes are substantially independent of an existing source at the same site." As § 122.29(b)(1)(iii) instructs, "[i]n determining whether these processes are substantially independent, the Director shall consider such factors as the extent to which the new facility is integrated with the existing plant; and the extent to which the new facility is engaged in the same general type of activity as the existing source."

>    *a. To what extent is the new facility integrated with the existing plant?*

**¶53** The record demonstrates that Shaft 10 is integrated with existing sources and operations of the mine. Shaft 10 works with existing infrastructure, including Shaft 9 and the Never Sweat Tunnel, to ventilate and dewater the underground workings of the mine.

---

[7] The Tribe suggests that this "Court might remand for a determination of whether Shaft 10 totally replaces the prior mine(s) under subsection (b)(1)(ii)." We will not do so for the reasons stated. But even if we were inclined to do so, any remand would be futile because we conclude that the "new source" test fails at both steps two and three, *see* Part II(B)(2), (3) ¶¶ 63, 71.

¶54 The "management of mine drainage is an integral part of most mining systems." Ore Mining and Dressing Point Source Category; Effluent Limitations Guidelines and New Source Performance Standards, 47 Fed. Reg. 25682, 25684 (June 14, 1982). Without proper mine drainage management, water will flood the mine's underground workings and disrupt operations. *See id.* at 25685 ("Water is a natural feature that interferes with mining activities."). To that end, Resolution drains water from Shaft 9 to the base of Shaft 10, pumps the water up to and through the Never Sweat Tunnel, combines that water with water collected from Shaft 8, and sends the water west to the water treatment plant for treatment and storage. Resolution has integrated these functions of Shafts 8, 9, and 10 and the Never Sweat Tunnel. Shaft 10 depends on existing infrastructure to serve the essential functions of ventilation and dewatering, which it does not do independently.

¶55 The Tribe claims that "Shaft 10 is not integrated into prior operations; those facilities are integrated into Shaft 10." But § 122.29(b)(1)(iii) does not draw this fine distinction. Instead, it expressly provides that we consider "the extent to which the new facility is integrated with the existing plant." 40 C.F.R. § 122.29(b)(1)(iii). And the record here demonstrates that Shaft 10 is materially integrated with existing infrastructure for purposes of performing the essential functions of ventilating and dewatering underground workings, which are necessary for the continued pursuit of copper ore. There is no evidence that Shaft 10 alone can ventilate and dewater the underground workings in the manner necessary for exploration and extraction of copper ore at the mine. Shaft 10 is integrated with existing features of the mine for its proper functioning. And the mere fact that Resolution extended the Never Sweat Tunnel does not change this determination. Shaft 10 is also substantially integrated with Shaft 9, which provides further support for the integrated workings. Thus, existing features and Shaft 10 facilitate the continued and integrated workings necessary for the pursuit of copper ore.

¶56 The Tribe points to a provision in the Federal Register where the EPA notes that "a minor change" to a process (like "a new purification step") does not make a facility a "new source"; but "if the only connection between the new and old facility is that they are supplied utilities such as steam, electricity, or cooling water from the same source or that their wastewater effluents are treated in the same treatment plant, then the new facility will be a new source." *See* NPDES Permit Regulations, 49 Fed. Reg.

at 38043. This provision does not support Shaft 10 being a "new source" in this case. Shaft 10 is integrated with existing infrastructure—the Never Sweat Tunnel and Shaft 9—to provide ventilation and dewatering, which are essential components of the mining process. These interconnected systems of ventilation and drainage are essential physical features of the mine structure. Thus, the integration here materially differs from a situation where the *only* connection between facilities is that "they are supplied utilities . . . from the same source" or that their water is "treated in the same treatment plant." *Id.*

> b. *To what extent is the new facility engaged in the same general type of activity as the existing source?*

¶57 We now consider the extent to which Shaft 10 "is engaged in the same general type of activity as the existing source." 40 C.F.R. § 122.29(b)(1)(iii). Shaft 10 supports the ventilation and dewatering of underground workings, which are necessary for the exploration, study, and extraction of copper ore. These are the same general types of activities as the existing source (i.e., the original workings of the mine that also supported ventilation and dewatering).

¶58 The Tribe argues that Shaft 10's activity is different from prior activity at the existing mine. In particular, the Tribe claims that dewatering Shaft 10 will be independent of the dewatering that previously took place at a different point of extraction; the mine has not been used to excavate copper ore for a period of time; and Resolution plans to extract from a new, untouched ore body using a different mining technique (panel caving) that will produce lower grade copper ore and increase the amount of ore production.

¶59 But these arguments miss the mark. The issue is whether Shaft 10 "is engaged in the same *general type of activity* as the existing source." 40 C.F.R. § 122.29(b)(1)(iii) (emphasis added). It is not focused on the specific manner by which "the same general type of activity as the existing source" is conducted, such as a precise mining technique, volume of production, time period, or location. *See also* NPDES Permit Regulations, 49 Fed. Reg. at 38044 (noting there is not a new source "if a facility increases capacity merely by adding additional equipment in one or two production steps"). Here, the historical mining operation in existence for over a century sunk new shafts and provided the ventilation and

dewatering necessary to discover, study, and extract new bodies of copper ore as the mine expanded in an eastward direction. Shaft 10 is engaged in that "same general type of activity"—providing ventilation and dewatering necessary to discover, study, and at some point extract copper ore (i.e., copper mining). 40 C.F.R. § 122.29(b)(1)(iii); *see also* NPDES Permit Regulations, 49 Fed. Reg. at 38044 ("The second clarifying factor that EPA has added is the extent to which the construction results in facilities or processes that are engaged in the same general type of activity as the existing source. Under this second factor, if the proposed facility is engaged in a sufficiently similar type of activity as the existing source, it will not be treated as a new source.").

¶60　　　　The Tribe also points to the following language from the EPA's guidance: "Of course, to the extent the construction results in facilities engaged in the same type of activity because it essentially replicates, without replacing, the existing source, the new construction would result in a new source." NPDES Permit Regulations, 49 Fed. Reg. at 38044. But Resolution's sinking of a new shaft 300 feet from Shaft 9 to pursue more ore does not "replicate" the existing source. This is unlike the situation described in the Federal Register where "a power company builds a new, but identical and completely separate power generation unit at the site of a similar existing unit," in which case "the new unit will be a new source." *Id.* Resolution constructed Shaft 10 and the mine's other new features to mine copper ore adjacent to the copper-ore deposits that were exhausted. There is no "replication" in this case where those ore deposits were exhausted. Merely pursuing a new ore deposit in a mining area (as mines often do) does not make a construction a "new source" by default—instead, the "new source" criteria must be evaluated.

¶61　　　　A construction is not a "new source" if it merely *could* operate substantially independently of the existing facility. The focus is on whether it actually *does* operate substantially independently. *See id.* (noting the EPA's agreement that it "should consider whether the new facility *actually* operates substantially independently of the existing facility, not whether it *could* operate substantially independently" (emphasis added)). The record does not establish that Shaft 10 does anything on its own. It is instead fully integrated into the mining process.

¶62　　　　Ultimately, § 122.29(b)(1)(iii) requires us to determine whether Shaft 10's "processes are substantially independent of an existing

21

source at the same site."   "Site" is broadly defined as "the land or water area where any 'facility or activity' is physically located or conducted, including adjacent land used in connection with the facility or activity." 40 C.F.R. § 122.2.   Shaft 10, the mine water treatment plant, and the other new features, such as the cooling tower, rock stockpiles, and wash bays, are included in and integrated into the same "site."   With Shaft 10 being just 300 feet from Shaft 9, Resolution will continue operating in the area where copper-ore mining previously took place within the confines of an earlier permit renewal.

¶63        We agree with ADEQ's explanation in its "new source" analysis: "The new features added to the mine are supporting the same process that has always existed at the site, which is extracting ore by any means or methods.   Therefore, there are no processes that are substantially independent of the existing process to extract ore."   The record before us supports this determination.   Shaft 10 does not meet the criteria in § 122.29(b)(1)(iii), and it therefore fails to meet the definition of "new source" at step two.

### 3.  Step Three

¶64        Although we conclude that Shaft 10 is not a "new source" at step two, we proceed to apply the remainder of the test at step three to clarify this issue of statewide importance.

¶65        Section 122.29(b)(2) provides that "[a] source meeting the requirements of paragraphs (b)(1)(i), (ii), or (iii) of this section is a new source only if a new source performance standard is independently applicable to it."   Thus, step three requires us to consider whether a new source performance standard is "independently applicable" to Shaft 10. In essence, this step differentiates between a "new source" and a "new discharger," because "[i]f there is no such independently applicable standard, the source is a new discharger."   40 C.F.R. § 122.29(b)(2).

¶66        The CWA sets forth new source performance standards that apply to "discharges from . . . [m]ines that produce copper."   40 C.F.R. § 440.100(a)(1); *see also* 40 C.F.R. § 440.104(a) (explaining that the effluent limitations in the new source performance standards apply to "pollutants discharged in mine drainage from mines that produce copper").   The CWA does *not* provide a new source performance standard for a single

"shaft." But the Tribe argues that Shaft 10 is "in and of itself a mine" under the CWA.

**¶67** A "mine" is "an active mining area, including all land and property placed under, or above the surface of such land, used in or resulting from the work of extracting metal ore or minerals from their natural deposits by any means or method." 40 C.F.R. § 440.132(g). "'Active mining area' is a place where work or other activity related to the extraction, removal, or recovery of metal ore is being conducted . . . ." 40 C.F.R. § 440.132(a).

**¶68** These definitional provisions describe a "mine" as a broader geographic area made up of "all land and property" used in or resulting from the work of extracting ore by any means or method.[8] *See All*, Merriam-Webster, https://www.merriamwebster.com/dictionary/all (last visited June 10, 2024) (defining "all" as "the whole amount, quantity, or extent of; as much as possible; every member or individual component of; the whole number or sum of"). The descriptions of "*all* land and property" and "a place where *work or other activity related to* the extraction, removal, or recovery of metal ore is being conducted" include Shafts 9 and 10, the Never Sweat Tunnel, and other features that work together to ventilate and dewater the underground workings necessary for Resolution to explore the Eastern Deposit and extract copper ore. *See* 40 C.F.R. § 440.132(a), (g) (emphasis added). These provisions do not describe a single shaft which "is the surface opening to the mine." *See Development Document*, *supra*, at 49–50.

**¶69** The Tribe claims that "Resolution will use Shaft 10 to extract copper ore from an untouched ore body." Resolution, however, asserts that "Shaft 10 would be used for dewatering and ventilation, not to remove ore." The Tribe has not introduced any evidence to support a finding that Resolution plans to excavate or remove copper ore in the Eastern Deposit from Shaft 10. According to Resolution's General Plan of Operations, in the event of future ore extraction, two new shafts "will be production shafts

---

8   The fact that a new mining method will be used for the Eastern Deposit—panel caving—does not change the analysis because the definition of "mine" includes extraction "by any means or method." 40 C.F.R. § 440.132(g).

dedicated to hoisting ore and other rock material from the Mine"—these will be Shafts 11 and 12. The Plan of Operations does not state that Shaft 10 will be used for ore extraction. Thus, we cannot speculate about such alleged future use of Shaft 10. But even if Shaft 10 is at some point used to extract a new ore deposit, this does not automatically make it a "new source." The CWA's "new source" criteria applicable to mines could have stated that a construction used to extract a new ore deposit is a "new source." But the CWA does not take this rigid approach. Instead, when ADEQ considers a discharge permit renewal, it must consider each step of the "new source" criteria and the evidence relevant to each step during the applicable time period.

**¶70** The ALJ's findings of fact—which the parties do not challenge here—include testimony describing Shaft 10 as a structure "related to the extraction, removal or recovery of metal ore."[9] Shaft 10 is not drilled directly into an ore body; it works with other features to conduct activities related to ventilating and dewatering underground workings. It is therefore a component of the mine and is not itself a "mine" under § 440.132(g).

**¶71** Shaft 10 does not have a new source performance standard "independently applicable" to it. *See, e.g.*, *Mahelona v. Hawaiian Elec. Co.*, 418 F. Supp. 1328, 1335 (D. Haw. 1976) ("[W]hile there are standards of performance governing steam electric generating plants, there are no regulations applicable solely to discharge facilities." (internal citation omitted)). Because Shaft 10 does not meet step three of the "new source" test, for this additional reason, it is not a "new source" under the CWA. *See* 40 C.F.R. § 122.29(b)(2).

### III. CONCLUSION

**¶72** We vacate paragraphs 1–20 and 30–72 of the court of appeals'

---

[9] The court of appeals explained that "the Tribe did not challenge any specific factual determinations below" and "[g]iven the parties have not raised any factual issues on appeal, we need not resolve any questions of fact." *San Carlos Apache Tribe*, 254 Ariz. at 186 ¶ 28. The same is true in this Court.

opinion.[10]   We affirm the superior court's decision that Shaft 10 is not a "new source" and that ADEQ acted within its discretion by issuing the 2017 Permit Renewal to Resolution.

---

[10]   Paragraphs 21–29 address issues of mootness, timeliness, and deference to factual determinations below that no party challenged before this Court.